RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0383P (6th Cir.)
File Name: 01a0383p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
      *Plaintiff-Appellant*
      *(98-6609/6633)/*
      *Cross-Appellee,*

      *v.*

JOHN DAVID WHITE,
      *Defendant-Appellee,*

CAROLYN F. TAYLOR,
      *Defendant-Appellee/*
      *Cross-Appellant*
      *(98-6634).*

Nos. 98-6609/
6633/6634

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 97-00013—Joseph H. McKinley, Jr., District Judge.

Argued: June 21, 2000

Decided and Filed: October 29, 2001

Before: KEITH, DAUGHTREY, and GILMAN, Circuit
Judges.

1

_____

**COUNSEL**

**ARGUED:** Ronald M. Spritzer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Jennifer O. True, Nicholasville, Kentucky, Stewart B. Elliott, Owensboro, Kentucky, for Appellees. **ON BRIEF:** Ronald M. Spritzer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Randy W. Ream, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellant. David Russell Marshall, Nicholasville, Kentucky, Stewart B. Elliott, Owensboro, Kentucky, for Appellees.

_____

**OPINION**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. Defendants John White and Carolyn Taylor, employees of the Ohio County (Kentucky) Water District, were convicted of making materially false statements regarding a matter within the jurisdiction of the federal government, in violation of 18 U.S.C. § 1001 (1994), by submitting reports containing falsified turbidity measurements to the Kentucky Division of Water. The district court sentenced White to two years' probation and a $5000 fine, and sentenced Taylor to two years' probation and a $1000 fine. The government now appeals the court's interpretation of the United States Sentencing Guidelines in determining White's and Taylor's sentences. Taylor cross-appeals, challenging both her sentence and various aspects of her prosecution. For the reasons set out below, we find no reversible error in connection with Taylor's conviction and sentence, and thus affirm that portion of the district court's judgment. We further hold, however, that the case must be remanded for re-sentencing as to White.

met in this case because Taylor's training and experience in water treatment plant operation made it significantly easier for her to falsify turbidity readings and to conceal the falsifications from the regulators. The Class 4A water treatment plant operator's license that Taylor held is the highest category operator's license that the state confers. It requires annual training, educational courses, and completion of an examination. While the actual entry of the numbers requires no particular skill, Taylor had to make certain calculations that took into account prior turbidity rates, temperature, chemical feed rates, etc., in order to reconstruct turbidity measurements that would have at least a superficial plausibility and thereby conceal the falsifications. Hence, the defendant's argument that two other operators also recorded turbidity measurements is not persuasive, given the fact that she has not shown that they would have been capable of committing *and* concealing the offense in the manner that she did.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court as to Carolyn Taylor, but VACATE the sentencing order as to John White and REMAND for resentencing in conformity with this opinion.

billing).

## PROCEDURAL AND FACTUAL BACKGROUND

John White was the general superintendent at the Ohio County Water District's drinking water treatment plant at Cromwell, Kentucky; Carolyn Taylor was a Water District employee assisting White in managing plant operations. Both were licensed by the state of Kentucky as Class 4A Water Treatment Plant Operators, which required multiple examinations and continuing education. As part of their job responsibilities, White and Taylor prepared monthly operations reports required by federal and state law to be submitted to the Kentucky Department for Environmental Protection's Division of Water. The Division of Water compiles this data from all the state's water districts as part of its enforcement responsibilities pursuant to the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j-18 (1994). The federal Environmental Protection Agency (EPA) funds the Division's data collection activities, and the Division sometimes works with EPA employees when investigating violations of the Act.

During a surprise inspection of the plant in January 1997, an agent from the Division noted that daily log books recording the measure of turbidity (the amount of suspended particulate matter in post-treatment water) had been left blank for each of four four-hour shifts between 4:00 p.m. January 13 and 8:00 a.m. January 14.[1] The plant employee responsible for recording these measurements told the Division agent that she had purposefully left the log sheets blank because the turbidity measurements were all above 0.5 nephelometric turbidity units (NTUs), which might put the

---

[1]Under federal law, water districts using filtration systems to treat surface water are required to measure "grab samples" of the turbidity of treated drinking water every four hours, unless the state approves use of alternative continuous turbidity monitoring mechanisms. *See* 40 C.F.R. § 141.74(c)(1) (1999). Workers at the Ohio County plant were asked to take several "grab sample" measurements during each four-hour period and enter the lowest of these measurements in their daily logs.

plant at risk of noncompliance with the Act.[2]    In February 1997, however, White submitted a monthly report to the Division which contained entries below the 0.5 NTU threshold for each of the four-hour shifts in question.  The Division then seized the Cromwell plant's daily log book and data sheets recorded by the plant's turbidimeters containing turbidity measurements for December 1996 and January 1997. Review of this evidence and subsequent interviews with plant staff, including White and Taylor, by Division and EPA agents revealed several instances of similar falsifications of turbidity measurements and submissions of inaccurate monthly reports, which suggested that the water plant had been out of compliance with the federal and state turbidity regulations during most of the months in question.

EPA employees investigating possible wrongdoing at the Cromwell plant shared  this evidence with Assistant United States Attorneys for the Western District of Kentucky, who informed Taylor that she could be charged with violating 18 U.S.C. § 1001,[3] but also said that she might qualify for

---

[2]Federal and Kentucky state regulations enforcing the Act require water districts to maintain treated water with less than 0.5 NTUs in 95% of all recorded measurements made each month.  *See* 40 C.F.R. § 141.73(a)(1); 401 KY. ADMIN. REGS. 8:150 (2000).  A public water system in Kentucky could thus submit no more than nine record entries above 0.5 NTUs, out of approximately 186 total entries each month, and still comply with the Act and its enforcing regulations.  At no time may the turbidity level in grab samples exceed 5 NTUs.  *See* 40 C.F.R. § 141.73(a)(2).

[3]    Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–
      (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
      (2) makes any materially false, fictitious, or fraudulent statement or representation; or
      (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
shall be fined under this title or imprisoned not more than 5 years, or both.

breached when they commit a crime. *See, e.g., Brown*, 7 F.3d at 1161; *Lamb*, 6 F.3d at 421.  It follows that the district court erred in reaching an opposite conclusion; on remand, the court should both correct this error and consider the propriety of also enhancing White's sentence pursuant to § 3B1.1.

### C.  *"Special Skill" Enhancement*

Finally, Carolyn Taylor contests the district court's decision to enhance her sentence pursuant to § 3B1.3 because she used a special skill "in a manner that significantly facilitated the commission or concealment of [her] offense."  We review such factual findings made as part of a § 3B1.3 enhancement determination for clear error.  *See United States v. Lewis*, 156 F.3d 656, 658 (6th Cir. 1998) (quoting *United States v. Atkin*, 107 F.3d 1213, 1219 (6th Cir. 1997)).

In holding that Taylor used a special skill, the district court specially noted the fact that Taylor possessed a 4A Water Treatment Plant Operators' License.  Taylor argues that her license is not evidence of a special skill because performing turbidity tests does not require certification, and because at the Ohio County plant such tests were regularly performed by unlicenced operators.  The commentary to § 3B1.3 defines a "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing," and lists as examples of persons with special skills pilots, lawyers, doctors, accountants, chemists, and demolition experts. *See* U. S. SENTENCING GUIDELINES MANUAL § 3B1.3 cmt. n.2 (1997). The district court found that, as a licensed plant operator, defendant Taylor possessed such skills and further found that her skills "significantly facilitated the commission or concealment of the offense."  A majority of the panel concludes that the district judge did not clearly err in making these findings.[7]  The guidelines test was

---

[7]Judge Daughtrey disagrees and would reverse the district court's determination and remand for resentencing on the basis of the court's analysis in *United States v. Weinstock*, 153 F.3d 272, 281 (6th Cir. 1998)(podiatric skills did not facilitate podiatrist's crime involving false

"position of public or private trust" is a term of art, "appropriating some of the aspects of the legal concept of a trustee or fiduciary," and not an approximation of "the ordinary dictionary concept of reliance or confidence." *United States v. Ragland*, 72 F.3d 500, 502-03 (6th Cir. 1996).

We do not believe that all members of the general public share such a quasi-fiduciary relationship with all public servants. It seems impossible that the sentencing commission intended that every "faceless" government bureaucrat performing her duties with some measure of discretion should be subject to an abuse-of-trust enhancement should she be convicted of any crime. White urges, as a limiting principle, that only elected officials should be considered to enjoy a trust relationship with the voting public making the enhancement appropriate. We disagree. In this case, it is obvious that customers of the Water District placed a high degree of trust in the District to provide them with potable drinking water, and granted the District substantial discretion, subject to federal and state regulation, as to how to provide such a service. The District, in turn, placed White in charge of its water purification efforts with apparently little or no administrative oversight; indeed, it appears that White's misdeeds would never have been discovered had there not been a surprise inspection by Division of Water agents. Given these facts, we believe that the quasi-fiduciary trust relationship between the District and its customers should be imputed to White, and thus that the abuse-of-trust enhancement was appropriate here given his violation of the public trust. Such a result appears to comport with the example from the guideline commentary of the bank executive who perpetrates fraud upon the bank's customers, many if not all of whom may not necessarily have known the executive's identity but engaged in a trust relationship with the bank and its administrative personnel nonetheless. This result also follows the apparent reasoning of our sister circuits that officers charged with protecting public health and safety, whether or not elected by or known to members of the public, enjoy a special trust relationship with the public that is

pretrial diversion as an alternative to prosecution. Although Taylor volunteered to testify before the grand jury in hopes of gaining pretrial diversion, in October 1997 the grand jury indicted White, Taylor, and plant operator Brenda Glenn on four counts, alleging violations of § 1001, conspiring to violate § 1001, and obstruction of justice.

Prior to trial, Taylor and Glenn moved to suppress statements made in interviews with EPA and Division agents. The district court denied these motions. At trial, Taylor moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that the court lacked jurisdiction over her case because sanction of her conduct was a matter within the jurisdiction of the Division of Water and not within that of the EPA, and also that the government could not prove that any statements made by Taylor were materially false. The court denied these motions, holding that Taylor's conduct involved a matter within federal jurisdiction and reserving the issue of whether the statements were materially false for the jury to decide.

The jury found Glenn not guilty on all counts, but found White and Taylor guilty on the second count of the indictment, which charged that the defendants

> each aided and abetted by the other, made and caused to be made a false material entry in that the defendants falsely entered turbidity readings onto the January Monthly Operating Report for the Ohio County Water District plant reflecting turbidity readings of less than .5 NTUS when in fact, as the defendants then and there knew, the true and correct turbidity readings were in excess of .5 NTUS.

Taylor moved for a judgment of acquittal notwithstanding the guilty verdict, renewing her jurisdictional argument and also urging the court to require the government to honor its "pre-

---

18 U.S.C. § 1001 (1994).

Indictment agreement for diversion."  The court denied this motion.

In his pre-sentence reports for White and Taylor, the federal probation officer handling their cases noted that the sentencing guideline ordinarily applicable to convictions pursuant to 18 U.S.C. § 1001 was § 2F1.1, entitled "Fraud and Deceit."  The officer stated his belief, however, that sentencing the defendants under § 2Q1.3, entitled "Mishandling of Other Environmental Pollutants; Record Keeping, Tampering, and Falsification," was more appropriate, as was increasing both White's and Taylor's base offense level by four levels pursuant to § 2Q1.3(b)(1)(B) because their offense "involved a discharge, release, or emission of a pollutant," and further increasing White's sentence by two levels pursuant to § 3B1.3 because White had abused a position of public trust in committing his crime. The district court held that deciding whether to sentence White and Taylor pursuant to § 2F1.1 or § 2Q1.3 was unnecessary, on the grounds that both sections provided for a base offense level of six, and that the enhancement under § 2Q1.3(b)(1)(B) did not apply because turbidity in treated water was not a "pollutant" that was released into the environment. The court also increased both White's and Taylor's sentence by two levels pursuant to § 3B1.3, not because either defendant abused a position of public trust, but because both defendants used a "special skill," as indicated by their qualifications for licensed employment at the plant, "in a manner that significantly facilitated the commission or concealment of the offense."  The court's use of the "special skill" enhancement precluded the government's suggested use of § 3B1.1(c) to increase White's sentence by two more levels as the alleged "organizer, leader, manager, or supervisor in . . . criminal activity," because under the guidelines, such an enhancement could not be used in addition to a § 3B1.3 "special skill" enhancement. Following its determination of the appropriate guidelines, the court sentenced White to two years' probation, including six months' home detention, and a $5000 fine, and sentenced Taylor to two years' probation, including three months' home detention, and a $1000 fine.

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Notably, the commentary fails, in its efforts to define the term "public or private trust," to include among its examples of positions of trust--an attorney's embezzlement of a client's funds, a bank executive's fraud scheme, and a physician's abuse of a patient--a scenario in which a defendant enjoys a trust relationship with the general public.  Instead, the commentary emphasizes the "substantial discretionary judgment" awarded to the defendant in a position of trust for purposes of § 3B1.3.  *See* U. S. SENTENCING GUIDELINES MANUAL § 3B1.3 cmt. n.1 (1997); *see also Tribble*, 206 F.3d at 637 (stating that "[a]ccording to our own precedent, and to the application notes . . . the level of discretion accorded an employee is to be the decisive factor" and, continuing, "the inherent nature of the work itself should naturally convey a substantial degree of discretion to the defendant concerning how to properly administer the property of another or otherwise act in their best interest").  Indeed, based on its reading of this commentary, this court has held that the phrase

the founder and director of the [public] school, he gained the public trust of the community that [the school] served."); *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993) ("It is axiomatic that the public places tremendous trust in prison employees that they will not conspire with inmates to violate the law."); *United States v. Lamb*, 6 F.3d 415, 421 (7th Cir. 1993) ("[P]olice officers are accorded public trust to enforce the law.  The public . . . expects that police officers will not violate the laws they are charged with enforcing.").

We have not, in the past, expressly held that the general public could be considered a victim of a government employee's crime, although we have decided, without explanation, cases in which the "general public as victim" theory could have applied by holding that the § 3B1.3 enhancement did apply.  *See Talley*, 194 F.3d at 766 (holding that lieutenant in sheriff's office abused position of public trust); *United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994) (finding no error in application of abuse-of-trust enhancement to sentence of speaker of Kentucky House of Representatives convicted under RICO of misuse of campaign funds); *United States v. Sivils*, 960 F.2d 587, 599 (6th Cir. 1992) (holding that enhancement applied to deputy sheriff's conviction and sentence).  We believe that our failure to so hold was because it is, or should be, self-evident that an enhancement for abuse of "position of *public* or private trust," U.S.S.G. § 3B1.3 (emphasis added), may be appropriate when the public has been victimized by the defendant's crime.  Should any confusion remain on this point, we now explicitly hold that the general public may be victims of a government employee's crimes for purposes of deciding whether the employee's sentence may be enhanced pursuant to § 3B1.3. This is not the end of our analysis, however.  We must decide whether White held a position of trust *vis a vis* the water district customers, and whether his charged conduct violated that trust.

To do so, we must turn to application note 1 to the commentary to § 3B1.3, which states:

The government now appeals from the court's sentencing order, arguing that the district court should have used guideline § 2Q1.3 as a basis for White's and Taylor's sentences, and then applied a "release of pollutant" enhancement pursuant to § 2Q1.3(b)(1).  The government also argues that the court should have used both the § 3B1.3 "abuse of trust" and § 3B1.1(c) "criminal supervisor" enhancements to increase White's sentence.  Taylor cross-appeals from the final judgment against her, challenging the court's determination that her case involved a matter within the jurisdiction of the federal government.  She also challenges the court's denials of her motion to suppress, her motion claiming that, as a matter of law, her statements were not materially false, and her motion seeking enforcement of the government's offer of pretrial diversion. Finally, she also appeals the court's use of the "special skill" enhancement in determining her sentence.

### DISCUSSION

### I.  Taylor Conviction Issues

### A.  Jurisdiction

Taylor first argues that the district court erred in determining that her alleged false statements, the inaccurate turbidity readings in the January 1997 Monthly Operating Report, pertained to a matter within the jurisdiction of a federal agency. Whether the district court correctly decided this jurisdictional  matter is a question of law that this court reviews de novo.  *See United States v. Shafer*, 199 F.3d 826, 828 (6th Cir. 1999).

18 U.S.C. § 1001 criminalizes the willful making of materially false statements "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  The primary purpose of this jurisdictional requirement is "to identify the factor that makes the false statement an appropriate subject for federal concern."  *United States v. Yermian*, 468 U.S. 63, 68 (1984). The Supreme Court has stated that the term "jurisdiction"

here should not be given a "narrow or technical meaning" for purposes of § 1001. *See Bryson v. United States*, 396 U.S. 64, 70 (1969). Instead, courts should apply

> [t]he most natural, nontechnical reading of the statutory language . . . that it covers all matters confided to the authority of an agency or department. . . . A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation. Understood in this way, the phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body.

*United States v. Rodgers*, 466 U.S. 475, 479 (1984) (citation omitted).

In distinguishing whether allegedly false statements made, as in this case, to state or municipal agencies or private entities related to "official" or "authorized" federal agency functions, rather than "peripheral" matters, we have in the past looked to whether the entity to which the statements were made received federal support and/or was subject to federal regulation. *See Shafer*, 199 F.3d at 828-29 (discussing *United States v. Gibson*, 881 F.2d 318, 322 (6th Cir. 1989), and *United States v. Lewis*, 587 F.2d 854, 855-57 (6th Cir. 1978)). In this case, the Division of Water, the recipient of Taylor's statement, reviews the turbidity data sent to it by all public water systems in the state that treat drinking water for human consumption pursuant to federal and state regulations. The Division applies each year for federal funding in order to administer their review and compliance programs; in fiscal year 1997, the Division received over $800,000 from the EPA. The EPA then audits the Division's programs to determine whether the Division is accurately monitoring compliance with federal regulations. The funding itself underscores the EPA's interest in monitoring these systems. Furthermore, although the Division has primary enforcement authority pursuant to the Safe Drinking Water Act over noncompliant local water systems, the Division enforces state

employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

The government challenges the court's rationale for its § 3B1.3 enhancement of White's sentence, claiming, as it did at trial, that White's sentence should have been adjusted because he abused a position of public or private trust in committing his offense; a reversal on this point would allow the government to seek an additional upward adjustment pursuant to § 3B1.1 for White's alleged aggravating role as an organizer, leader, manager, or supervisor of criminal activity at the plant. We review a district court's "abuse of trust" determination de novo. *See United States v. Tribble*, 206 F.3d 634, 635 (6th Cir. 2000).

In analyzing claims that an abuse-of-trust enhancement should apply to a criminal defendant's sentence, this court has necessarily identified whether the defendant held a position of trust, and whether the position of trust facilitated the commission of the crime. *See, e.g.*, *United States v. Talley*, 194 F.3d 758, 766 (6th Cir. 1999), *cert. denied*, 528 U.S. 1180 (2000). The heart of the dispute between the parties here involves what is arguably a threshold question, however: the identity of White's victims. The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct. *See United States v. Moored*, 997 F.2d 139, 145 (6th Cir. 1993). White, following the district court, argues that his victims were the EPA and the Division of Water, the government agencies to which he was required to report turbidity levels. The government claims that the residents of Ohio County who received drinking water treated at the facility White managed were also victims of White's conduct. In so doing, the government echoes the opinions of numerous courts that have, when deciding whether to enhance a government employee defendant's sentence pursuant to § 3B1.3, appeared to treat the general public as victims of the employee's conduct, in place of or in addition to the government agency or agencies they served. *See, e.g.*, *United States v. Robinson*, 198 F.3d 973, 978 (D.C. Cir. 2000) ("Because Robinson was

no way in which the § 1001 offenses themselves could be considered substantive environmental offenses. We therefore conclude that the language in the separate provisions of and commentaries to § 2Q1.2 and § 2Q1.3, which appear to limit use of "release of pollutant" enhancements to convictions pursuant to substantive criminal environmental offenses or the recordkeeping offenses concealing them, prevents the use of the § 2Q1.3(b)(1) enhancements the government argues are appropriate here.

In sum, even if turbidity is considered a "pollutant" for purposes of § 2Q1.3(b)(1), the district court did not err in refusing to enhance White's and Taylor's sentences pursuant to this guideline provision because their "recordkeeping offense" cannot be said to reflect an effort to conceal a "substantive environmental offense" under the Safe Drinking Water Act or any other federal statute. The only substantive offense involved in this case was the violation of § 1001; under either § 2F1.1 or § 2Q1.3, if applied, the defendants' base offense level for this criminal conduct would be six. We therefore hold that the district court did not err in finding that the sentencing calculation under either guideline would be the same.

### B.  *"Abuse of Trust" Enhancement*

The district court enhanced both White's and Taylor's sentences pursuant to guideline § 3B1.3, because it found that both defendants used a special skill in committing their § 1001 fraud offenses. Section 3B1.3 states:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based on an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be

regulations which are required to be no less stringent than those regulations promulgated by the federal government. *See* 40 C.F.R. § 142.10. Should the Division fail to monitor local water systems properly and enforce compliance with the regulations, the EPA also has statutory enforcement authority. *See* 42 U.S.C. § 300g-3(a), (b), (g) (West 1999) (granting EPA Administrator authority to issue civil compliance order or commence civil action should the state with primary enforcement authority fail to commence appropriate enforcement action); 42 U.S.C. § 300i(a), (b) (granting Administrator authority to issue orders or commence civil actions where "imminent and substantial endangerment" to public health exists); 42 U.S.C. § 300j-4(b) (authorizing Administrator or her representatives to enter drinking water treatment plants to ascertain compliance with national drinking water regulations). The government presented uncontroverted testimony at trial that the EPA exercised its enforcement authority, at the behest of Division of Water officials, with regard to several noncompliant local water systems in Kentucky. These federal enforcement actions, although perhaps secondary to those by states, like Kentucky, with primary enforcement authority, evince a federal interest in what reasonably must be considered an official function of the EPA, ensuring safe drinking water for all persons residing in the United States. We therefore hold that the false statements made to the Division regarding drinking water turbidity levels came within the jurisdiction of the EPA for purposes of prosecution under § 1001.

We are not the only court to so hold. In *United States v. Wright*, 988 F.2d 1036 (10th Cir. 1993), the Tenth Circuit reached a similar conclusion. As superintendent of a drinking water treatment plant in Sequoyah County, Oklahoma, Wright filed false turbidity reports with the county's health department. *See Wright*, 988 F.2d at 1037. He moved unsuccessfully in district court to dismiss the indictment against him that alleged a violation of § 1001. *See id.* In affirming the district court's denial of the motion to dismiss, the court stated:

[T]he false turbidity data filed by Mr. Wright fell within the jurisdiction of the EPA. A grant of primary authority is not a grant of public authority. . . . The Act requires the Administrator to promulgate maximum contaminant level goals and national primary drinking water regulations. The regulations relating to the collection and reporting of turbidity data, described above, were promulgated pursuant to that charge and authority. The EPA retains the authority, in the discharge of its duties under the Act, to enforce its regulations; and, turbidity data clearly concern an authorized function of the EPA.

Furthermore, in this situation, the EPA is actively involved in assuring state compliance with national safe water standards. It audits, reviews, and evaluates the state of Oklahoma's program, including an inspection of the monthly reports of the type involved in this case. Such reports, therefore, directly implicate the ongoing function and mission of the agency. In addition, the Act expressly authorizes the EPA to take enforcement actions in states having primary enforcement authority.

Finally, EPA's funding of the Oklahoma public water program is conditioned, in part, on the results of its annual evaluations of that program. This court is in accord with other circuits which have found that a state agency's use of federal funds, standing alone, is generally sufficient to establish jurisdiction under section 1001.

*Id.* at 1038-39 (citations omitted). Although our case law appears to require more than the mere expenditure of funds to establish jurisdiction pursuant to § 1001, *see United States v. Holmes*, 111 F.3d 463, 465-66 (6th Cir. 1997), the combination of reasons given by the *Wright* court for its holding persuades us that federal jurisdiction is appropriate in this case as well. Taylor's attempts to distinguish her case from *Wright*, by contending that Kentucky has exclusive enforcement authority over local water systems and that the EPA was not funding the Division's recordkeeping programs,

---

level for the substantive offense." Although the commentary to § 2Q1.3 does not include a limiting rule similar to that in § 2Q1.2, we infer that § 2Q1.3(b)(5) is the only enhancement in the guideline that applies to "recordkeeping offenses."

In seeking enhancements under § 2Q1.3(b)(5) for White's and Taylor's convictions pursuant to 18 U.S.C. § 1001, the government apparently asks us to accept § 1001 as a "recordkeeping offense." Regardless of whether the defendants' § 1001 convictions should be considered "recordkeeping offenses," however, neither the Safe Drinking Water Act nor any other federal statute contains a "substantive environmental offense" criminalizing the defendants' conduct, even if that conduct is thought to include allowing the release of contaminated water into the environment. The defendants' purported recordkeeping offenses thus do not -- indeed, cannot -- reflect an effort to conceal a substantive environmental offense, because no federal statute criminalizes the regulatory violations underlying the defendants' fraudulent conduct.[6] We also see

---

[6] The Safe Drinking Water Act differs from the statutes specifically covered by guideline § 2Q1.3 on this point. *See* 42 U.S.C. §§ 300f-300j-18 (provisions of Safe Drinking Water Act); *cf.* 33 U.S.C. § 1319(c) (criminal conduct provisions of Clean Water Act); 33 U.S.C. § 1415(b) (criminal conduct provisions of Marine Protection, Research, and Sanctuaries Act); 33 U.S.C. §§ 1907, 1908 (criminal conduct provisions of Act to Prevent Pollution from Ships); 42 U.S.C. § 7413 (criminal conduct provisions of Clean Air Act). The Safe Drinking Water Act and accompanying regulations accomplish federal enforcement of the Act, when necessary, primarily by administrative order or civil action. *See* 42 U.S.C. § 300g-3 (civil and administrative enforcement of drinking water regulations). The Act contains two provisions criminalizing conduct relating to the provision of safe drinking water: § 300h-2, which prohibits willful violations of state laws regulating underground injection control programs, and § 300i-l, which prohibits tampering, attempted tampering, or threatened tampering with a public water system *with the intention of harming persons. See* 42 U.S.C. § 300i-l. Separate guideline provisions, § 2Q1.2, § 2Q1.4, and § 2Q1.5 cover punishments for convictions pursuant to these sections of the Act. Because the defendants here were not convicted of violating either § 300h-2 or § 300i-l and their proven conduct was not prohibited by either statute, the government acknowledges that these sections do not apply.

F.2d 1200, 1203, 1207 (4th Cir. 1986) (recognizing that measures of "suspended solids" in water, although not pollutants, indicated presence of pollutants and that violations of permits regulating such measurements issued pursuant to Clean Water Act caused significant longterm environmental harm); *Louisiana v. Lee*, 758 F.2d 1081, 1085 (5th Cir. 1985) (recognizing turbidity as among "environmentally disruptive" effects of dredging); *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 375-76 (D.C. Cir. 1981) ("Increased river turbidity . . . can interfere with fish habitats and upset the ecology of backwater areas.").

But even were we to join our sister circuits in holding that over-turbidity is a "pollutant" for purposes of § 2Q1.3, such a holding would not mean that the enhancements stated in § 2Q1.3(b)(1) should apply to White's and Taylor's sentences. We believe that ultimately the regulatory character of the Safe Drinking Water Act and the language and structure of the sentencing guidelines as a whole preclude the use of the enhancements the government seeks. The background to the commentary to § 2Q1.3, which applies to conduct involving the mishandling of nonhazardous substances and/or related record-keeping offenses, states that the section parallels § 2Q1.2, involving the mishandling of pesticides and other toxic or hazardous substances. *See* U. S. SENTENCING GUIDELINES MANUAL § 2Q1.3 cmt. background (1997). Section 2Q1.2(b) contains six subsections detailing "specific offense characteristics" enhancing a defendant's base offense level; the first of these is the parallel to § 2Q1.3(b)(1), the "release of pollutant" enhancement at issue here. The background to the commentary to § 2Q1.2 states that "[t]he first four specific offense characteristics provide enhancements when the offense involve[s] a substantive violation. The last two specific offense characteristics apply to recordkeeping offenses." U. S. SENTENCING GUIDELINES MANUAL § 2Q1.2 cmt. background (1997). Section 2Q1.2(b)(5), one of the "last two" enhancements referred to in the commentary and precisely paralleled by § 2Q1.3(b)(5), states that "[i]f a recordkeeping offense reflect[s] an effort to conceal a substantive environmental offense, use the offense

are factually inaccurate and thus do not provide a basis for finding a lack of jurisdiction here.

### B.  Materiality

Perhaps because "[t]here can be no valid conviction under § 1001 'unless both jurisdiction and materiality are shown,'" *United States v. Rutgard*, 116 F.3d 1270, 1287 (9th Cir. 1997) (quoting *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989) (en banc)), Taylor next questions whether the evidence presented at trial sufficiently proved that her allegedly false statements were "material" for purposes of § 1001. As with other sufficiency-of-the-evidence questions, we determine whether evidence sufficiently supported a § 1001 conviction by deciding "whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

A showing of "materiality" is a fairly low bar for the government to meet: a statement is "material" in this context if it has the natural tendency to influence or is capable of influencing a federal agency. *See United States v. Lutz*, 154 F.3d 581, 588 (6th Cir. 1998). A showing of actual influence, or actual agency reliance, is unnecessary, *see United States v. Keefer*, 799 F.2d 1115, 1128 (6th Cir. 1986); indeed, "'[t]here is no implicit requirement that the [false] statements be made directly to, or even received by, the federal department or agency.'" *Lutz*, 154 F.3d at 587 (quoting *Gibson*, 881 F.2d at 322). If the false statements are received by an agency, they may be material even if the receiving agent or agency knows that they are false. *See United States v. Rogers*, 118 F.3d 466, 472 (6th Cir. 1997).

Still, the fact that materiality is a low hurdle does not mean that it is *no* hurdle; the government must present at least some evidence showing how the false statement in question was capable of influencing federal functioning. In this case, we conclude, the government presented enough "circumstantial"

evidence of how the false statements could have affected EPA functioning--apart from Taylor's prosecution under § 1001 itself--to support her conviction. Both EPA agent Libby Haines and FBI agent Wayne McAllister testified that they investigated the Ohio County plant at the behest of the Division. Vicki Ray, the manager of the drinking water branch of the Division of Water, testified that the Division had turned over several local drinking water systems with reporting violations to the EPA for "federal enforcement." Ray also described what "enforcement" of the regulations means: noncompliant local water systems receive notification of a violation and then are required to correct the problem, and are told to notify their customers regarding violations by newspaper announcement and, if necessary, by direct mail or through radio and television advertisements. Ray's description dovetails with the procedures stated in and mandated by federal drinking water regulations, *see* 40 C.F.R. § 141.32, which, as discussed above, the EPA regularly carries out, with or without state cooperation. Through the testimony of Haines, McAllister, and Ray, the jury could have found that the false statements in the Ohio County plant's monthly report, if discovered, had the capacity to affect the EPA's administrative enforcement of the drinking water regulations.

Taylor argues that because the regulations allow up to nine record entries, or 5% of the total entries for the month, to be above 0.5 NTUs before a water system's monthly report would be flagged for noncompliance and/or possible enforcement action, the four false entries in the January 1997 report should not have been found to be material. This argument ignores the fact that the false entries, even if not violations in and of themselves, when discovered could and did lead to the seizure of other plant records which demonstrated more severe instances of noncompliance over a longer period of time, all of which was documented at trial. Because Taylor's statements influenced the course of an investigation, which, apparently, still could result in an agency enforcement action, they were materially false for purposes of her prosecution.

§ 141.70(a); 40 C.F.R. Ch. I, Subpt. O, App. C; 40 C.F.R. § 141.153(d)(4)(v), and thus appear to indicate the EPA's intent that turbidity be considered a "contaminant" for regulatory purposes.

The government also notes that the plain meaning of the terms "contaminate" and "pollute" are, for the most part, synonymous, and therefore argues that turbidity reasonably may be called a pollutant. Webster's Dictionary defines "contaminate" as "to soil, stain, or infect by contact or association," and lists as a "sometimes interchangeable" synonym the term "pollute." Webster's New Collegiate Dictionary 245 (1975). "Pollute" is defined as "to make physically impure or unclean . . . to contaminate (an environment)." *Id.* at 891. As the government points out, nothing in guideline § 2Q1.3 suggests construing the term "pollutant" more narrowly for federal sentencing purposes; in fact, the commentary to the guideline indicates just the opposite, stating that "[a] wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered" by § 2Q1.3(b)(1). U. S. Sentencing guidelines Manual § 2Q1.3 cmt. n.4 (1997). Finally, the government cites language from the Clean Water Act, another federal statute targeting the safety of the national water supply. That act defines the term "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, *biological materials*, radioactive materials, heat, wrecked or discarded equipment, *rock*, *sand*, cellar dirt and industrial, municipal, and agricultural waste discharged into water," 33 U.S.C. § 1362(6) (emphasis added), a description that appears to include turbidity.

We appreciate the logic in the government's position. Furthermore, we note that other courts have, implicitly if not explicitly, recognized over-turbidity as at least a regulatory proxy for pollutants in various legal contexts. *See, e.g., Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 895-96 (Fed. Cir. 1986) (referring to turbidity as "water pollution"); *Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784

preponderance of the evidence. *See United States v. Crowell*, 997 F.2d 146, 149 (6th Cir. 1993).

In setting White's and Taylor's base offense level at six, the district court held that choosing between § 2F1.1 and § 2Q1.3 was unnecessary because the sentence enhancements available at § 2Q1.3(b)(1), potentially increasing the defendants' sentences by four or six levels, did not apply. The court stated:

> The Court finds that in the present case turbid water cannot be considered a pollutant. Turbidity has been defined simply as a measure of water clarity or a measure of particles in the water. The Government cites no case law, statute, or regulation in support of its argument that turbidity is a pollutant under § 2Q1.3(b)(1)(A). Instead, the only argument the Government makes is that when the turbidity readings are above .5 NTUs, the risk of there being harmful bacteria in the drinking water increases. This alone is insufficient. The water leaving the plant was cleaner than the water coming into the plant. It just wasn't clean enough. However, there is no evidence in the record that a pollutant was discharged into the environment. Therefore, the Court finds that no increase is warranted . . . .

In response to the court's challenge regarding legal support for its enhancement claim, the government on appeal cites to the Safe Drinking Water Act and its enforcing regulations defining "turbidity," not as a "pollutant," but rather as a "contaminant," and then claims that for sentencing purposes the two concepts should be seen as substantive equivalents. The government's argument may be summarized as follows: The Act defines the term "contaminant" as "any physical, chemical, biological, or radiological substance or matter in water." 42 U.S.C. § 300f(6). Regulations enforcing the Act set maximum drinking water contaminant levels for turbidity separate from those for any other regulated contaminant, *see* 40 C.F.R. § 141.13, distinguish turbidity from other contaminants in a number of other respects, *see* 40 C.F.R.

### C.  Suppression of Taylor's Statements

Taylor next appeals the district court's denial of her motion to suppress, arguing that inculpatory statements she made in a May 21, 1997 interview with agents Haines and McAllister in her home should be suppressed as violative of her Fifth Amendment right against self-incrimination.[4] We review a district court's findings of fact regarding a suppression motion for clear error, and its related conclusions of law de novo. *See United States v. Bencs*, 28 F.3d 555, 558-59 (6th Cir. 1994).

In its order denying Taylor's suppression motion, the district court made the following factual findings:

> The Court finds that Special Agent Haines and Special Agent McAllister traveled to Defendant's residence in Ohio County on May 21, 1997. The Agents introduced themselves to Taylor, showed their identification, and told her they were conducting an investigation into false statements on turbidity reports submitted by the plant for whom she worked. . . . Taylor consented to be interviewed in her house. The interview lasted approximately thirty minutes. Taylor had complete freedom of movement; she was not handcuffed or physically restrained. The agents made no suggestion that she was not free to leave.

A review of the undisputed testimony of agents Haines and McAllister from a pretrial suppression hearing indicates that the court did not clearly err in stating this factual scenario. We conclude that because Taylor was therefore objectively not in custody at the time of the interview, there is no basis

---

[4] Taylor's appeal brief also seeks suppression of statements made on July 9, 1997. Her motion to suppress in the district court, however, does not mention these statements or identify how their admission into evidence would violate her constitutional rights. As a general rule, we do not review suppression issues raised for the first time on appeal. *See United States v. Critton*, 43 F.3d 1089, 1093-94 (6th Cir. 1995).

for her claim that she should have been advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

### D.  Pretrial Diversion

Taylor also argues that the district court erred in denying her various requests that an alleged pretrial diversion agreement with the government be enforced and her indictment therefore dismissed.  In pressing this issue, Taylor alleges that she agreed to the government's offer of pretrial diversion, but that the government subsequently revoked its offer.  Unfortunately for Taylor, the record here contains no evidence that she and the government reached an enforceable pretrial diversion agreement.  Taylor alleged in the district court that agents Haines and McAllister first promised her pretrial diversion after their May 21 interview.  There is no evidence, however, that the agents were authorized to make promises or representations to induce Taylor's cooperation, authority usually reserved to United States Attorneys.  As we have previously noted, a promise made by a government employee other than the United States Attorney that a defendant will not be indicted cannot bind the United States Attorney unless breach of such an agreement resulted in a fundamentally unfair prosecution, a circumstance not present here.  *See United States v. Streebing*, 987 F.2d 368, 373 (6th Cir. 1993).

Taylor also claims that Assistant United States Attorney Randy Ream similarly promised her pretrial diversion in a letter dated June 18, 1997.  The letter from Ream to Taylor, however, states only that "the case against you is *under consideration for* pretrial diversion" and that it "has been referred to the United States Probation Office for *a recommendation as to whether you can be placed on pretrial diversion*."  (Emphasis added.)  Regardless of Taylor's subjective belief as to what Ream stated, the language in the June 18 letter supports the government's contention that, judged objectively, Ream made no offer of pretrial diversion to Taylor and, therefore, that the district court could not have enforced the agreement Taylor now alleges existed.  Nor does

Taylor point to evidence that she reasonably relied to her detriment on any promise she believed the government may have made.  We thus conclude that the district court did not err in refusing to dismiss Taylor's indictment or order her participation in pretrial diversion.

### II.  Sentencing Issues

### A.  Base Offense Level and "Release of Pollutant" Enhancement

The government challenges the district court's decision to set both White's and Taylor's base offense levels at six without choosing between § 2F1.1, the guideline generally applicable to violations of 18 U.S.C. § 1001, and § 2Q1.3, a guideline pertaining to the reporting of false environmental data to government authorities.[5]  The government also argues that the district court erred in holding that enhancement pursuant to § 2Q1.3(b)(1) was inappropriate because the offense for which White and Taylor were convicted did not result in or otherwise involve a discharge, release or emission of a pollutant into the environment.  In reviewing a district court's sentencing decision pursuant to the guidelines, we review all determinations of fact for clear error, and we review the court's application of the guidelines to the facts de novo.  *See United States v. Waldon*, 206 F.3d 597, 608 (6th Cir.), *cert. denied*, 531 U.S. 881 (2000).  The government must prove all facts used in sentencing determinations by a

---

[5]The Statutory Index to the Sentencing Guidelines specifies § 2F1.1 as the guideline "ordinarily applicable" to convictions pursuant to 18 U.S.C. § 1001.  *See* U. S. SENTENCING GUIDELINES MANUAL, Appendix A (1997).  The Index also states, however, that "[i]f, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted."  *Id.*  The commentary to § 2F1.1 itself also suggests considering use of another guideline if more appropriate to the defendant's charged conduct.  *See* U. S. SENTENCING GUIDELINES MANUAL, § 2F1.1 cmt. n.13 (1990).