File Name: 10a0331n.06

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

Nos. 08-5875/5948

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jun 01, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | KENTUCKY |
| | ) | |
| LINDSEY A. BROOKS; | ) | **O P I N I O N** |
| MICHELLE L. LOVELACE, | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |
| | ) | |

BEFORE:  BOGGS and NORRIS, Circuit Judges; ADAMS, District Judge.[*]

**ALAN E. NORRIS, Circuit Judge.**  If nothing else, this appeal provides a cautionary tale about the dangers of misplaced loyalty.  Defendants Michelle Lovelace and Lindsey Brooks misled agents from the federal Defense Criminal Investigative Service ("DCIS") who were investigating two murders that they believed had been committed by Sergeant Brent Burke, a military police officer assigned to the base at Fort Campbell, Kentucky.  In the course of their respective interviews, defendants initially told the agents that they were still in Burke's company at 1 a.m. on the day of the murders even though he had left the base earlier.  Although Lovelace recanted her initial

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

1

statement during the interviews and Brooks, less explicitly, did the same, the two were indicted and

charged with one count each of knowingly making false statements to agents of the DCIS. 18 U.S.C.

§ 1001. Lovelace was also charged with aiding and abetting Brooks. 18 U.S.C. § 2. A jury returned

guilty verdicts on both counts of the indictment. On appeal, defendants contend that the evidence

introduced at trial was insufficient to support the verdict and that the district court erred in allowing

the introduction of evidence concerning the two murders. Brooks also maintains that her statements

should have been suppressed because she had not been informed of her *Miranda* rights before the

agents conducted what she characterizes as a "custodial" interrogation.

## I.

This prosecution had its genesis in the murders of Tracy Burke and her former mother-in-law,

Karen Comer, on September 11, 2007. The pair were shot to death at Ms. Comer's home in

Rineyville, Kentucky during the early morning hours. Rineyville is about 140 miles from Fort

Campbell. Kentucky State Police ("KSP") detective Larry Walker responded to the call later in the

day and learned that Tracy and her husband, Sergeant Brent Burke, were in the process of getting

divorced. Sergeant Burke became a suspect and Walker, accompanied by other KSP officers,

traveled to Fort Campbell to conduct interviews. Burke told Walker that he had been with

defendants, who worked in Fort Campbell's Emergency Communications Center ("ECC") as

dispatchers, until 1 a.m. on the day of the murders.

Because of the military aspect of the investigation, KSP requested the assistance of the DCIS,

and Walker spoke with Special Agents Bret Flinn, Mike Collins, and Jared Camper. He provided

the DCIS agents with a "laundry list" of things to do, which included interviewing the defendants.

Agents Collins and Camper spoke to both defendants at the ECC on September 14, three days

after the murders. They interviewed defendant Lovelace first and she initially told them that Burke

brought her and defendant Brooks hot chocolate at 11:00 p.m. on September 10, and that the three

of them remained in the parking lot until 1:00 a.m. During the interview, the agents took a thirty-

minute break and spoke with Lovelace's supervisor, Barbara Guerrero. After the interview resumed,

the agents noted minor inconsistencies. For instance, Lovelace told them she took a five-minute

drive around the block of the ECC with Burke at 1 a.m., a fact she had neglected to mention earlier.

The next day, September 15, the agents asked Lovelace to provide a written statement, which

she did. At trial Agent Camper summarized its contents during his testimony. Lovelace confirmed

that Burke had indeed delivered hot chocolate around 11 p.m., but now conceded that she left after

about 20 minutes to go home. Before she did so, she gave Burke a ride around the block. After she

left Burke, she called him on his cell phone about ten minutes later. The next time they spoke was

when he called her at 9 p.m. the next day (September 11). According to her statement, their

conversation concerned the following:

> He told me that Tracy and her ex-mother-in-law had been shot and killed. . . . He
> then told me that people would question me and to tell them that he was talking to
> me and Ms. Brooks 'til about 0100 that morning. I interpreted it that he was referring
> to investigators and told him that we were not on the phone at that time. He told me
> to tell Ms. Brooks that Tracy and her ex-mother-in-law had been shot and killed and
> that we needed to say we were talking in the parking lot of Fort Campbell ECC until
> about 0100 that morning. I said, "okay" and he said he had to get off the phone.
>
> I called Ms. Brooks and asked her to go get me some cigarettes and to please
> come to my house. . . . When she arrived at my house, I then asked Ms. Brooks if she

wanted to go on the back deck of my house and smoke. When we sat down to smoke I told her that Sergeant Burke told me to tell her that we were talking in the parking lot of work 'til around 0100 hours that morning; and she said, of course. I was thinking that it was odd that he said to tell her that we were talking 'til 0100 hours.

. . . .

[F]riday during my first interview, I told Special Agent Camper and Special Agent Collins that Sergeant Burke was inside visiting with Ms. Brooks and I [sic] from around 2215 'til 2244 10 September 07 . . . .

I then lied telling them that we talked in the parking lot 'til around 0100 hours. I lied because Sergeant Burke told me to tell the investigators this time and I did so because I trusted him as a friend.

During the second interview Special Agent Collins advised me of the consequences [of] making false statements. It was then that I realized that I needed to tell them the truth, that there is no way that I would've stood in the parking lot talking with Ms. Brooks and Sergeant Burke for approximately two hours because I had earaches and wanted to go home.

It was at this moment I realized that I and possibly Ms. Brooks had been used as alibis. I told the special agents that I felt I had been used a pawn.

Agent Camper recalled that he told Lovelace during the second interview (after speaking with her supervisor), that "we thought she was lying with us, and that this was a double homicide investigation, and we were talking about the alibi of a prime suspect, so you need to tell the truth." After stressing this and the fact that it "was a crime to lie to federal agents," Lovelace "finally admitted that she was in the parking lot until 11:30."

Defendant Brooks was interviewed after Lovelace. The interview lasted between two and three hours and took place at the ECC. According to the trial testimony of Agent Collins, Brooks told them that "[s]he left Michelle and Sergeant Burke in the parking lot of the ECC at

approximately one o'clock in the morning." When challenged, however, she vacillated, saying that

it "was between twelve o'clock midnight and 12:30." The next day Brooks provided the agents with

a written statement at their request. Agent Collins summarized it during his testimony and read the

following portions of it to the jury:

> I felt in [Burke's] defense I could stretch the truth and allow my time with him on Monday night, 10 September 07, to expand to one o'clock . . .
>
> . . . .
>
> [A]pproximately 2250 hours Brent left the center on Michelle Lovelace's and my request for hot chocolate. Approximately 2300 hours myself and my two partners, Michelle and Barbara, left the building. As soon as I made it out the door, I turned around and went back inside to sign out for the evening. When I made it back to my truck, Michelle was standing by her vehicle. We both waited for what felt like 10, 15 minutes until Brent drove up.
>
> . . . .
>
> [S]oon after, Michelle stated she was going to go home and go to bed. Brent walked over to the passenger side and got in the car. I said my goodbyes, they drove away, and I walked down the hill where I got on the internet and searched for the Britney Spears 2007 video music award performance. I believe I entered the building after midnight between 0000 hours and [0030] hours?
>
> . . . .
>
> [W]e were <u>not</u> . . . outside until 0100 hours. . . .
>
> . . . .
>
> Upon arrival at Michelle's house [the next evening] I met Michelle's mom and son for the first time. Michelle told me to sit down and she informed me of the shootings that took place the night before. . . . I then asked what the extent of the injuries were, and she stated, "Lindsey, they're dead."
>
> [S]he said Brent also wanted us to remember that we were in the parking lot until

5

0100 hours. I replied, stating we were out there close to 0100 but not 0100 hours. And she said, well, he just wanted us to make sure we remembered we were all together until 0100. I don't feel at the time we were conspiring, conspire is a negative word to me, but I did agree to the time frame with Michelle on Brent's behalf.

[W]e were his alibi. She agreed with my statement and it became our unspoken agreement to stretch our time frame to 0100 hours.

Although neither woman had a criminal history, they were indicted, tried, and convicted by a jury on all charges of the indictment. Each received a sentence of two years of probation.

## II.

*1. Sufficiency of the Evidence*

Both defendants contend that the evidence produced at trial was constitutionally insufficient to support the jury's finding of guilt beyond a reasonable doubt. The substantive portion of the statute of conviction provides as follows:

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

**(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1001.

"A violation of § 1001 is comprised of five elements: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) *the statement is material;* (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency." *United States v. Dedman*, 527 F.3d 577, 598 (6th Cir. 2008) (quoting *United States v. Lutz*, 154 F.3d 581, 587 (6th Cir. 1998)) (emphasis added). It is the third element of the crime – materiality – that defendants contend the government failed to prove.

"A showing of 'materiality' is a fairly low bar for the government to meet: a statement is 'material' in this context if it has the natural tendency to influence or is capable of influencing a federal agency." *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001). A showing that the statement actually influenced a federal agency is not required. *Id.*; *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001) ("if a statement could have provoked governmental action, it is material regardless of whether the agency relied upon it").

To prevail on a sufficiency of the evidence challenge, defendants must show that, viewing the evidence in a light most favorable to the government, no rational juror could find guilt beyond a reasonable doubt. *United States v. Mabry*, 518 F.3d 442, 448 (6th Cir. 2008). "This standard is a great obstacle to overcome, and presents the appellant in a criminal case with a very heavy burden." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (citation omitted).

As she did below, defendant Lovelace contends that her false statements were not material because she recanted them before the DCIS agents concluded their interviews with her, and her statements could therefore not influence any subsequent decisions by the agents. In *United States*

7

*v. Cowden*, 677 F.2d 417 (8th Cir. 1982), the Eighth Circuit reversed defendant's § 1001 conviction for making a false statement to a customs agent. Defendant checked "no" on the box of a form that asked whether he was carrying over $5,000 on his person. However, the agent became suspicious when he felt a parcel at the bottom of defendant's briefcase. When he "pointedly asked" defendant if he was carrying over $5,000, the defendant sought to amend his declaration. Permission was refused and defendant was prosecuted and convicted.

In reversing the conviction, the court focused on the element of materiality. Although it recognized that "the government is not obliged to prove an influence *in fact* on the agency's operations," the court observed "[t]he Customs inspection should be conducted so that the probable result is compliance with the law, not the eliciting of a violation of the law," and defendant should have therefore been permitted to amend his declaration because he sought to do so "almost immediately." *Id.* at 419-420 (emphasis added).

While other circuits have cited *Cowden*, none has elected to rely upon it to reverse a § 1001 conviction. For instance, in *United States v. Beaver*, 515 F.3d 730 (7th Cir. 2008), the Seventh Circuit reviewed a § 1001 false statement given in the course of a price-fixing investigation. It noted that § 1001 contains no recantation defense, and that "the materiality of [an accused's] false statements must be assessed at the moment he uttered them." *Id.* at 742.

The Ninth Circuit took a similar approach in *United States v. Salas-Camacho*, 859 F.2d 788 (9th Cir. 1988). Defendant was stopped at the Mexican border and questioned about the contents of the truck he was driving. He denied having anything to declare. However, the inspector checked

8

his background and learned that defendant had a prior arrest for possession of undeclared steroids.

*Id.* at 789. When confronted with this information by the inspector, defendant admitted that he had

steroids in his truck. The court distinguished *Cowden* in affirming the conviction:

> The facts of our case are readily distinguishable from those in *Cowden.* Appellant only made his declaration once he was confronted with the imminent inspection of his vehicle and the revelation that the inspector knew of his earlier stop for importing steroids into the United States. It cannot be said, therefore, that his false statement to Inspector Davidson "was almost immediately corrected by a true oral statement." *Cowden*, 677 F.2d at 420. We hold that appellant's delayed admission does not reduce the materiality of his earlier false statements.

*Id*. at 792; *see also Sebaggala*, 256 F.3d at 64 (rejecting defendant's argument that § 1001 contains

an implied recantation defense).

Because Brooks never explicitly acknowledged that she lied to the DCIS agents, she does not

rely upon *Cowden* and instead argues that her statements, even if false, were not capable of

influencing the DCIS investigation because the agents knew by the time that they began interviewing

her that the alibi Burke had asked her to provide was untrue. According to Agent Collins, "I

challenged her . . . and said, look, you're lying to us . . . because we've already spoke [sic] to

Michelle." Given that the agents knew that the statements given by Brooks were a lie, she contends

that they were incapable of influencing the investigation.

Not surprisingly, the government disagrees. Both defendants testified at trial that, as

dispatchers, they knew the importance of giving accurate information and, by providing an alibi for

Burke, they were "capable of influencing" the investigation. Moreover, the fact that the authorities

are aware that a statement is false does not affect its materiality. *United States v. LeMaster*, 54 F.3d

1224, 1230-31 (6th Cir. 1995). In his closing argument, the prosecutor made the point that, had the agents not pressed defendants, they might not have told the truth and the investigation would have been led astray.

Having considered these arguments, we now affirm. As have other circuits, we read *Cowden* narrowly. While defendant Lovelace undeniably retracted her false statements, she did so only after being confronted by the agents who warned her of the possible consequences of lying to them. Thus, this case is much closer to *Salas-Camacho* than it is to *Cowden* and, like the Ninth Circuit in *Salas-Camacho*, we decline to extend *Cowden* to cover instances where a false statement is retracted only after authorities have challenged its veracity. We also reject the contention that defendants' statements were not capable of influencing the actions of the federal agents investigating the murders. It is inconceivable to this court that defendants did not understand that they were providing an alibi to a suspect in a murder investigation. Not only were their statements capable of influencing the actions of the agents by misdirecting them, that was precisely their intent. The fact that the agents quickly recognized the falsity of the statements speaks volumes about the relative naivete of the defendants but does not render the statements immaterial or absolve defendants of criminal liability.

## 2. Admission of Evidence concerning the Murders

Before the trial, the government filed a motion *in limine* seeking to introduce statements concerning the double homicide. Counsel for defendants opposed the request and suggested that the court instead inform the jury that Burke was charged with a "serious felony offense." As counsel for

10

Brooks put it in his response to the motion *in limine*, "The jury doesn't need to know that Burke was being investigated for murder, only that he was a suspect in a criminal investigation and that defendants were being interviewed in connection with that investigation." The district court thought otherwise and said as much at a March 25, 2008 pretrial conference:

> I'm going to allow you to say what the nature of the . . . investigation was . . . because . . . I don't think that the . . prejudice outweighs its probative value. I think it has probative value in regard to materiality and the timing of the accountability and the accountability of the sergeant's time. I think it's important.

On appeal, defendants challenge the relevance of these statements and, in the alternative, argue that the potential for prejudice outweighed their probative value. Fed. R. Evid. 403.

We review evidentiary decisions for an abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997). "Our review of a Rule 403 ruling is limited in that we must look at the evidence in 'the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)). Moreover, "[a]buse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Carter*, 463 F.3d 526, 528 (6th Cir. 2006).

We affirm the district court on this issue. Our review of the trial transcript reveals no attempt by the prosecution to make improper use of the admittedly grave underlying criminal charges. Rather, the prosecutor told the jury the following during his opening statement:

> [T]his case is not . . . as to whether Sergeant Burke is guilty or innocent. That's not a decision that will be made in this courthouse this week.

11

He enjoys the presumption of innocence, as do Ms. Lovelace and Ms. Brooks. . . .

This understated opening statement with respect to the fact that defendants lied to agents who were investigating a murder characterized the prosecution's low-key approach throughout the trial. We hold that the testimony related to the murders was not overly prejudicial and the district court did not abuse its discretion when it permitted its introduction.

### 3. *Suppression of Brooks' Statements*

Lastly, Brooks appeals the denial of her motion to suppress the statements that she made to the DCIS agents. As she did below, Brooks contends that the interviews were custodial in nature and that, because she was not given a *Miranda* warning, they must be suppressed.

On appeal from the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and its conclusions of law *de novo. United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (65h Cir. 1999).

The district court conducted a hearing on the motion. Only one witness, DCIS special agent Collins, testified. He stated that he and agent Camper conducted the interview in a side room of the ECC. Brooks was asked first if she would consent to the questioning and she agreed. Brooks sat next to the door and the interview lasted between two and a half and three hours. During that time, the agents took several breaks and Brooks took one bathroom break. When asked why he did not

read Brooks her *Miranda* rights, Collins replied, "It wasn't a custodial interview." He also stated,

"[S]he could have left at any time." *Id.* However, Collins conceded that he never explicitly told her

so.

At the conclusion of the hearing, the district court gave its reasons for denying the motion:

[C]ounsel have correctly identified the issue as to whether or not this was a custodial setting. The factors that the Court should look at will be the circumstances surrounding the interrogation. The second, given those circumstances, whatever a reasonable person would have felt, that she was not at liberty to terminate the interrogation and leave.

In reviewing all this evidence the Court finds that a reasonable person would have felt that they could have terminated this . . . interrogation and left at any time. The interrogation occurred at . . . work in a . . . room with a window to it adjacent to a work area. No restraints were placed on . . . Ms. Brooks.

The testimony has been that she was provided the opportunity for breaks if she wanted them. She did take one break. That they never told her, as the best I could tell, that she could leave, but they never told her she couldn't. It was subjective intent, as I understood the testimony, was she could have left at any time.

When I look at the subjective impression of the defendant, based on her subsequent actions, I think it was relevant that she called and wanted to meet with them again. If she felt that she had been in the custody the first time, I don't think she would want to meet with them again and felt in custody . . . the second time. And the focus of the investigation was not on . . . Ms. Brooks. The focus of the investigation had to do with Mr. Burke.

When I consider all those factors, the Court finds that this is not a custodial investigation, nor custodial statement, and that *Miranda* rights did not attach. And the Court denies the defendant's motion to suppress the statement.

We affirm the district court on this issue. In reaching this conclusion, we note that the facts

of this case closely resemble another decision of this court, *United States v. Mahan*, 190 F.3d 416

(6th Cir. 1999). In *Mahan*, we outlined the factors that inform a decision of when an interrogation

13

is considered custodial for *Miranda* purposes:

> "[T]he issue of whether a suspect is 'in custody,' and therefore entitled to Miranda warnings, presents a mixed question of law and fact qualifying for independent review." *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the *Miranda* doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *See also Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (stating that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.").

*Id.* at 421. As in the case before us, the defendant in *Mahan* was interviewed at work, he was never told that he was not free to go, the door of the interview room was unlocked, arrest was never threatened, and no show of force was made, such as the use of handcuffs or the brandishing of a firearm. *Id.* at 422. The circumstances surrounding Brooks's questioning were similar and we conclude that a reasonable person in her position would have felt free to leave.

**III.**

The judgments of appellants Lovelace and Brooks are **affirmed**.