*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0348P (6th Cir.)
File Name: 03a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

    *v.*
                  No. 02-1031

MICHAEL J. KUHN,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 99-20060—David M. Lawson, District Judge.

Argued: May 6, 2003

Decided and Filed: October 1, 2003

Before: BOGGS, Chief Circuit Judge; GUY and
DAUGHTREY, Circuit Judges.

─────────────

### COUNSEL

**ARGUED:** Jennifer J. Peregord, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. William A. Brisbois, BRISBOIS & BRISBOIS, Saginaw, Michigan, for Appellee. **ON BRIEF:** Jennifer J. Peregord, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant.

William A. Brisbois, BRISBOIS & BRISBOIS, Saginaw, Michigan, for Appellee.

─────────────

### OPINION

─────────────

BOGGS, Chief Circuit Judge. Michael J. Kuhn was sentenced to six months at a halfway house and six months of supervised release following his conviction for improperly discharging a pollutant into navigable waters, causing an employee to falsify test results in records submitted to the government, and signing and submitting a report to the government that he knew contained false test results. The government now appeals a four-level downward departure granted by the district court to Kuhn. For the reasons set forth below, we reverse, and remand the case for resentencing.

Kuhn was the Superintendent of the Bay City, Michigan, Wastewater Treatment Plant (the Plant). The wastewater that comes into the Plant goes through a number of stages before being released into the Saginaw River. On or about August 25, 1996, during the midnight shift, staff at the Plant began cleaning the chlorine contact chamber, which is the penultimate stage of the process. The Plant had a National Pollutant Discharge Elimination System (NPDES) permit that governed its operation under the Clean Water Act (CWA). The plant was obligated to notify the Michigan Department of Environmental Quality (DEQ) within five days of any accidental spill or bypass of the treatment system. At the end of August 1996, sludge from the chlorine contact chamber was illegally pumped into a ditch while the chlorine contact chamber was being cleaned. This was done on Kuhn's orders. In November 1996, Kuhn had the soil from the ditch excavated and hauled away.

Pursuant to the Plant's NPDES permit, the Plant was required to submit monthly discharge monitoring reports to the DEQ. As superintendent, Kuhn certified the accuracy of the information in these reports. The reports contained data regarding laboratory findings charting both the material coming into the Plant ("influent") and the material being discharged from the Plant ("effluent"). A Plant technician drew Kuhn's attention to very high numbers for BOD-5[1] on a sample drawn May 3, 1997. Kuhn asked the technician to change the results, and the technician refused. The technician made a copy of the original printout, suspecting that the numbers might be altered in the final report to the DEQ. Later, another technician gave the final report for the month of May to Kuhn for his review and signature. He told her that the test results for suspended solids, total phosphorous, and BOD-5 for May 3 must be wrong and asked her to change the numbers to the averages for the month. She refused. However, when she checked the final report, the data for May 3 had been changed to the monthly averages.[2] Kuhn then asked yet another technician to change the test results, which he did. The technician wrote a memo memorializing the fact that he had changed the test results at Kuhn's direction. Kuhn signed the final, altered report on June 10, 1997, and submitted it to the DEQ.

Kuhn was subsequently indicted in a four-count indictment that charged: first, that between August 23 and 30, 1996, Kuhn knowingly caused plant workers to dispose of sewage sludge improperly, which resulted in the sludge flowing into a ditch on the plant property and then into the Saginaw River, a navigable waterway, in violation of 33 U.S.C. § 1345(a) and

---

[1] "BOD-5" refers to a test which measures a wastewater sample's "Biochemical Oxygen Demand" over a 5-day period.

[2] Kuhn maintains that the high numbers were only for the influent flow and that the numbers for the effluent flow were in line with the monthly averages. He therefore purportedly concluded that the influent flow numbers must have been incorrect.

18 U.S.C. § 2; second, that between the same dates he knowingly caused the sewage sludge to be discharged from the ditch into the Saginaw River, in violation of 33 U.S.C. § 1311(a) and 18 U.S.C. § 2; third, that on June 9, 1997, he caused an employee to assist in falsifying test results that were included in records that, under the CWA, were required to be filed, in violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; and fourth, that on June 10, 1997, he signed and submitted to the DEQ a discharge monitoring report, required by the CWA, which he knew contained the false test results, in violation of 33 U.S.C. § 1319(c)(4).

After a three-week jury trial, the jury returned a verdict of guilty on all counts. Kuhn filed a post-verdict motion for judgment of acquittal. The district court granted this motion in part, dismissing count two on double jeopardy grounds. The presentence report (PSR) calculated Kuhn's sentencing range at 30-37 months, with a total offense level of nineteen. This number was reached by finding a base offense level of six for count one (U.S.S.G. § 2Q1.3(a)). The PSR then recommended two four-level increases for specific offense characteristics: pursuant to § 2Q1.3(b)(1)(B), due to the offense involving a discharge or release of a pollutant; and pursuant to § 2Q1.3(b)(4), due to the offense involving a discharge without a permit or in violation of a permit. The PSR recommended two additional two-level increases: pursuant to § 3B1.1(c) for Kuhn's role as an organizer, leader, manager, or supervisor in a criminal activity; and pursuant to § 3B1.3 due to his abuse of a position of public trust in a manner that significantly facilitated the commission or concealment of this offense. This resulted in a recommended adjusted offense level of eighteen for count one.

For counts three and four, the PSR recommended a base offense level of six (§ 2Q1.3(a)) with the same two increases for leadership role and abuse of a position of public trust. This resulted in a recommended adjusted offense level of ten for counts three and four. According to the grouping rules, found at § 3D1.4, one offense level was added to the group

with the highest adjusted offense level. Therefore, the recommended combined adjusted offense level was nineteen.

At the sentencing hearing, the defense objected to the addition of the increases for the two specific offense characteristics. The court overruled this objection, finding that application of the two specific offense characteristics did not constitute double-counting. Next, the government objected to the PSR's omission of its requested 11-level enhancement pursuant to § 2Q1.3(b)(2) because the offense resulted in a substantial likelihood of death or serious bodily injury. The court overruled the government's objection. Next, the government objected to the PSR's failure to include a two-level increase for obstruction of justice, pursuant to § 3C1.1 and application note 4(b), based on Kuhn's false testimony given at trial. The court overruled the government's objection.

The defense did not object to the two two-level increases for Kuhn's leadership role and abuse of a position of public trust. The defense, however, did move for a downward adjustment or departure, based on § 2Q1.3, application notes 4 and 7, which advise the court that upward and downward departures are appropriate depending upon the harm or risk associated with the offense. The court departed downward two levels with regard to each offense characteristic, for a total of four levels subtracted from the adjusted offense level for count one. The court explained that testing of the affected areas did not indicate any presence of PCBs, that the chlorine contact chamber was the last stage that polluted water reached before it was released into the environment, and that there were serious questions in the court's mind "as to whether any of the contents of that ditch ever made it into the Saginaw River."

At this point, the adjusted offense level for count one stood at fourteen. The court then calculated that, pursuant to § 3D1.4, two levels were to be added to that for grouping purposes. This resulted in a combined offense level of

sixteen. The defense then moved for a downward departure based on Kuhn's acts of a charitable or public service nature within the community.

The court denied the motion, but went on to state that it doubted that a 21- to 27-month term of incarceration "serves the ends of justice in this case." The court stated that it questioned the two two-level adjustments for role in the offense and abuse of a position of public trust. It stated that "the offense in this case did not necessarily entail an abuse of trust that was separate and apart from the defendant's position that permitted him to be a leader or organizer of the activity." Therefore, the court concluded, scoring the two adjustments in a single case constituted an over-counting. Moreover, the court stated that, although applying the two specific offense characteristics did not constitute double-counting, it "put undue weight on the offense characteristics for this specific offense," because the offense for which Kuhn was convicted consisted of a single discharge. The court also noted that it felt that the sentence in the case

> ought to be fashioned around the fact that the discharge in this case resulted from essentially a single incident that occurred over a day or two, and was motivated by the defendant's desire to make the plant more efficient so that it would perform the function of enhancing the environmental quality as opposed to degrading it.

Therefore, the court departed downward by four additional levels.

In its judgment, the court added more reasons for granting the additional four-level downward departure, indicating that "[t]he circumstances of this case, including the defendant's motivation and purpose, takes this case out of the 'heartland' of offenses contemplated by the Sentencing Guidelines." First, the court reiterated that Kuhn "was motivated by a desire to clean up and improve the efficient operation of the Bay City Wastewater Treatment Plant." Apparently, the court

concluded that Kuhn was taking a shortcut, engaging in conduct not authorized by the permit issued to the plant, and violated the Clean Water Act in so doing. The court went on to say:

> Given the defendant's background, however, his length of service in the area of public waste management, and other minor factors such as his community involvement and exemplary personal record of achievements in the community, the Court finds credible the defendant's professed motive that the efficient, pollution-free operation of the Bay City Wastewater Treatment Plant was his ultimate goal.

Therefore, the court imposed a sentence based on offense level twelve and a criminal history category of I. Kuhn was sentenced to six months at a halfway house, six months of supervised release, and the minimum fine of $6,000.

The government filed a timely notice of appeal, appealing the unguided four-level downward departure.[3] It first argues that the district court gave no notice to the government of its intention to depart on the basis of Kuhn's role in the offense and abuse of a position of public trust enhancements, nor on the basis of the application of the specific offense enhancements of § 2Q1.3. The government argues that even if it had received proper notice, the downward departure on these bases was improper. Finally, the government argues that the additional reasons for the downward departure added in the district court's judgment were not supported by any factual bases and are discouraged factors for downward departures under the sentencing guidelines, and that the district court did not give notice of its intent to depart downward on these bases.

---

[3]The initial four-level downward departure, pursuant to § 2Q1.3, application notes 4 and 7, was a guided departure.

We review a district court's decision to grant a downward departure for an abuse of discretion. *See United States v. Reed*, 264 F.3d 640, 646 (6th Cir. 2001) (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)). A sentencing court may impose a sentence outside the guidelines range only if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). A district court abuses its discretion when it fails to give notice of its intention to depart. *See Burns v. United States*, 501 U.S. 129, 135 n.4 (1991); *United States v. Yang*, 281 F.3d 534, 547 (6th Cir. 2002). The district court departed downward based on three reasons. We consider the validity of these reasons separately below.

1. *Departure based on enhancements for Kuhn's role in the offense and abuse of a position of public trust.*

The district court failed to give notice to the government of its intention to depart on this basis. Rule 32 of the Federal Rules of Criminal Procedure provides that:

> Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

Fed. R. Crim. P. 32. The district court's failure to notify the government that it was planning to depart on this basis was error. *See Yang*, 281 F.3d at 547.

Even if the district court had given the government notice, the downward departure based on these enhancements was improper. During the sentencing hearing, defense counsel conceded, and the district court found, that both

enhancements were proper in this case. However, the district court stated that the enhancements, if applied cumulatively, over-counted because "the offense in this case did not necessarily entail an abuse of trust that was separate and apart from the defendant's position that permitted him to be a leader or organizer of the activity." In its judgment, the district court added to its rationale, stating that the abuse of trust enhancement should be discounted because "a significant number of members of the general public did not enjoy a beneficial or quasi-fiduciary relationship with the defendant in his role as a public servant."

The abuse of a position of public trust enhancement "applies to persons who abuse their positions of trust . . . to facilitate significantly the commission or concealment of a crime." U.S.S.G. § 3B1.3, comment. (backg'd.). "[A position of public or private trust is] characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." *Id.* at comment. (n.1). As the district court impliedly found when it applied the enhancement, Kuhn satisfied these elements.

The district court's reasoning that the abuse of trust enhancement should be discounted because "a significant number of members of the general public did not enjoy a beneficial or quasi-fiduciary relationship with the defendant in his role as a public servant" is invalid under our opinion in *United States v. White*, 270 F.3d 356 (6th Cir. 2001). There we held that "the general public may be victims of a government employee's crimes for purposes of deciding whether the employee's sentence may be enhanced pursuant to § 3B1.3." *Id.* at 371. The defendant in *White* was a general superintendent at a drinking water treatment plant who was convicted of filing false reports. Although the question there was whether the enhancement should apply to White, while here we are reviewing a downward departure after the enhancement has already been applied, the court's holding is relevant here. The district court's statement in

departing downward seems to indicate that it believes the enhancement should not have been applied. If this is the case, then the district court should not have applied the enhancement in the first place. However, it is clear that the enhancement was properly applied. Kuhn was a government employee, charged with the safe and efficient operation of a wastewater treatment operation. He was convicted of knowingly causing sewage sludge to be discharged into a navigable waterway and falsifying reports. The statutes that were violated were in place to protect the general public from this sort of activity. It is difficult to see how members of the general public were not in a beneficial relationship with Kuhn, as significant numbers of the public depended upon Kuhn to prevent or ameliorate water pollution in the area. Moreover, his high-level position with respect to his public function of wastewater treatment, "contributed in some significant way to facilitating the commission" of his offense. U.S.S.G. § 3B1.3, comment. (n.1).

The aggravating role enhancement "increase[s] the offense level based upon the size of the criminal organization . . . and the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, comment. (backg'd.). It generally addresses a defendant's relative responsibility for the crime. Again, the district court found that Kuhn satisfied these elements when it applied the enhancement. The aggravating role enhancement relates to Kuhn's role as a supervisor over others in the operation of the Plant. Kuhn directed others to discharge the contents of the chlorine contact chamber into the ditch, and directed technicians to change test results.

Applying these two enhancements cumulatively does not "over-count," as each enhancement has elements that are not necessary for the determination of the other. In *White*, this court addressed the appropriateness of applying both a leadership and an abuse-of-trust enhancement. *See White*, 270 F.3d at 371-73. The district court in *White* applied the § 3B1.3 enhancement solely because it found the defendants

used a special skill in committing their offenses. *Id.* at 370. When it declined also to apply the enhancement because of the abuse of a position of public trust, the district court foreclosed the government from seeking an aggravating role enhancement under § 3B1.1. *Ibid.* (citing § 3B1.3 "if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).") We reversed, and remanded the case to the district court, directing that it apply the abuse-of-trust enhancement and to "consider the propriety of also enhancing White's sentence pursuant to Section 3B1.1." *Id.* at 373.

"Absent an instruction to the contrary, the adjustments from different guideline sentences are applied cumulatively (added together)." U.S.S.G. § 1B1.1, comment. (n.4). As the district court found that Kuhn satisfied the requirements for the enhancements, it was an abuse of discretion to find that the application of the enhancements together constituted double-counting and therefore merited a downward departure. A sentencing court may impose a sentence outside the guidelines range only if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). It is clear that the Sentencing Commission took into consideration the application of two or more enhancements for the same conduct. The district court did not identify any facts or circumstances that would take Kuhn's case outside of the "heartland" of offenders who violate their position of public trust while simultaneously supervising others in illegal activity.

The district court erred first by not notifying the government that it intended to depart on this basis. Even if proper notice had been provided, the district court abused its discretion in departing on this basis.

2.  *Departure based on the specific offense enhancements of Section 2Q1.3*

Section 2Q1.3 addresses the offense for which Kuhn was convicted. The relevant specific offense characteristics are:

b) Specific Offense Characteristics
(1) (A) If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment, increase by 6 levels; or
(B) if the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels.
(2) If the offense resulted in a substantial likelihood of death or serious bodily injury, increase by 11 levels.
(3) If the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels.
(4) If the offense involved a discharge without a permit or in violation of a permit, increase by 4 levels . . . .

U.S.S.G. § 2Q1.3.

The district court enhanced Kuhn's base offense level by four levels for both § 2Q1.3(b)(1)(B) and § 2Q1.3(b)(4), as the offense involved "a discharge" and "a discharge . . . in violation of a permit." In doing so, the district court specifically stated that applying both specific offense characteristics did "not constitute double counting."

The application notes to each enhancement authorize downward or upward departures based on several factors. For § 2Q1.3(b)(1)(B), applicable if the offense involved a discharge of a pollutant, application note 4 contemplates an upward or downward departure based on "the harm resulting from the . . . discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation . . . ." U.S.S.G. § 2Q1.3, comment. (n.4). For § 2Q1.3(b)(4), applicable if the offense involved a discharge without a permit or in violation of a

permit, application note 7 contemplates an upward or downward departure based on "the nature and quantity of the substance involved and the risk associated with the offense . . . ." U.S.S.G. § 2Q1.3, comment. (n.7). The district court granted Kuhn two two-level guided downward departures pursuant to these two application notes, noting that the environmental harm did not seem to be very great. The government does not challenge these two guided departures.

The district court then gave as one reason for its additional unguided four-level downward departure, the application of both these specific offense characteristics, stating that "[a]ll discharges or emissions of a pollutant, in the context of a violation of the applicable statutory section in this case, necessarily must be accomplished in violation of or absent a permit. Where a single discharge occurred, the scoring of both these factors puts undue weight on these offense characteristics in this case."[4]

The government first argues that the district court failed to give notice that it intended to depart downward for this reason. However, the defendant moved for a downward departure on this basis and objected to the PSR on this basis; thus, the government was sufficiently on notice that this issue would be addressed at the sentencing hearing. *See* Fed. R. Crim. P. 32.

The government also argues that the court had already determined that applying both offense characteristics did not constitute double-counting and had already granted Kuhn a two-level downward adjustment for each of subsections (b)(1)(B) and (b)(4), and it contends that this more than

accounted for the frequency of the discharges and the nature of the harm posed by Kuhn's offenses. We agree.

A district court abuses its discretion when it departs based on a factor already considered by the Commission in the guidelines. *Koon*, 518 U.S. at 111. The district court noted that the offense-level characteristics accounted for the fact that Kuhn's offense was not ongoing or repetitive, yet went on to say that it was "persuaded that the sentence ought to be fashioned around the fact that the discharge in this case resulted from essentially a single incident that occurred over a day or two . . . ." But as we indicated in *United States v. Rapanos*, 235 F.3d 256 (6th Cir. 2000),[5] quoting § 5K2.0, "[D]issatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." *Id.* at 260. In *Rapanos*, we found that the district court abused its discretion when it granted two additional one-level downward departures after granting two two-level downward departures pursuant to application notes 4 and 7. *Ibid.* We noted that although the guided departures were authorized by the facts found by the district court, the facts found did not authorize the additional unguided departures, because "[a] district court abuses its discretion when it takes into account a factor already considered by the Commission in the guidelines." *Id.* at 259-61.

In this case, the guidelines take into account the factors that concerned the district court. Section 2Q1.3(b)(1)(B)

---

[4]The government argues that the district court erred in stating that "a single discharge occurred," stating that trial testimony confirmed that sludge was discharged on two separate occasions, although the government does not cite any trial testimony to this effect. However, whether the trial testimony reflects this fact is not dispositive on this issue.

[5]On bases not relevant here, this judgment was vacated by the United States Supreme Court, *Rapanos v. United States*, 533 U.S. 913 (2001), and remanded to this court. We in turn remanded the case to the district court, *United States v. Rapanos*, 16 Fed. Appx. 345, 2001 WL 868006 (6th Cir. July 13, 2001). The district court set aside the defendant's conviction and dismissed the case. *United States v. Rapanos*, 190 F. Supp. 2d 1011 (E.D. Mich. 2002). On appeal, we reversed. *United States v. Rapanos*, 339 F.3d 447 (6th Cir. 2003).

contemplates its application in the event of "a discharge," meaning a single discharge as does section 2Q1.3(b)(4). The district court also was able to address its concerns by granting the two guided departures and by declining to apply a six-level enhancement applicable to discharges that were "ongoing, continuous, or repetitive." U.S.S.G. § 2Q1.3(b)(1)(A). The sentencing guidelines more than adequately take into account the frequency of the discharges and the threat of environmental harm posed by Kuhn's crimes. The district court's comment that it had "considerable thoughts and doubt about whether the sentence, a custodial sentence, of 21 months to 27 months serves the ends of justice in this case," indicates a "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines," which we noted in *Rapanos* "is not an appropriate basis for a sentence outside the applicable guideline range." 235 F.3d at 260 (quoting the commentary to § 5K2.0).

The district court also reasoned that the application of both enhancements placed undue weight on the offense characteristics because "[a]ll discharges or emissions of a pollutant, in the context of a violation of the applicable statutory section in this case, necessarily must be accomplished in violation of or absent a permit." However, when it applied both specific offense characteristics, the district court noted that the sentencing guidelines will contain an application note to direct the court when it should not apply both of two overlapping specific offense characteristics. The court stated that while it believed one could not violate § 2Q1.3(b)(1)(B) without violating § 2Q1.3(b)(4), "that's how the sentencing guidelines are constituted." It then stated that "in this particular case . . . applying offense characteristics in B1B [sic] and also in subparagraph (4) does not constitute double counting."

Section 2Q1.3(b)(1)(B) and section 2Q1.3(b)(4) are two distinct offense level adjustments within an offense guideline and are intended to be applied cumulatively. The guidelines

instruct that "[t]he offense level adjustments from more than one specific offense characteristic within an offense guideline are cumulative (added together) unless the guideline specifies that only the greater (or greatest) is to be used." U.S.S.G. § 1B1.1, comment. (n.4); *see also United States v. Perkins*, 89 F.3d 303, 308 (6th Cir. 1996).

The application of both specific offense characteristics is either double counting or it is not. The district court cannot first apply both specific offense characteristics and then revisit its decision when deciding whether to grant a downward departure. If the Sentencing Commission believed the application of both constituted double counting, it would have added an application note, as contemplated in § 1B1.1. Without such an application note, it seems that the Sentencing Commission has already taken the application of both specific offense characteristics into account when it designed the guidelines. "A district court abuses its discretion when it takes into account a factor already considered by the Commission in the guidelines." *Rapanos*, 235 F.3d at 259. The district court did not provide any indication of facts that would place Kuhn's case outside the "heartland" of environmental crimes involving one or two discharges. Any concerns with the fairness of whether one would always qualify for an enhancement pursuant to § 2Q1.3(b)(4) if one qualified for an enhancement pursuant to § 2Q1.3(b)(1)(B) are best addressed to Congress.

The district court abused its discretion in departing downward on this basis.

3.  *Departure based on Kuhn's motivation and purpose*

The district court offered as a further reason for granting a downward departure Kuhn's motivation and purpose. It stated that given his background, length of service in the area of public waste management, and other factors such as his community involvement and "exemplary personal record of achievements in the community," it found "credible the

defendant's professed motive that the efficient, pollution-free operation of the Bay City Wastewater Treatment Plant was his ultimate goal." The court concluded that because of this pure motive, Kuhn's case fell outside of the "heartland" of pollution offenses.

First, we note that the district court erred by not giving notice to the government that it intended to depart on this basis. Second, we are unable to find any authorization in the guidelines for a downward departure based on a defendant's good motive for committing a crime. We reserve judgment on whether some permissible ground may be found that would incorporate this reason. In any event, the government should have been afforded the opportunity to present its arguments to the district court. The district court must give the government the proper notice of any intended basis for departure, should it choose to do so again.

4.   *Conclusion*

Therefore, we VACATE Kuhn's sentence and REMAND to the district court for resentencing.