**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael J. KUHN, Defendants.**

**No. 99–20060–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Jan. 12, 2005.

Michael J. Hluchaniuk, U.S. Attorney's Office, Bay City, MI, for Plaintiff.

Edward J. McNeely, III, McNeely, Crampton, Grand Rapids, MI, William A. Brisbois, William Brisbois & Associates, Saginaw, MI, for Defendants.

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE**

LAWSON, District Judge.

The defendant, Michael J. Kuhn, is the former superintendent of the Bay City Wastewater Treatment Plant. He was charged in a four-count indictment with criminal violations of the Clean Water Act, 33 U.S.C. § 1311, *et seq.* (the Act). Two counts of the indictment allege that the defendant caused the discharge of sewage sludge into a ditch that led directly into the Saginaw River. The other two counts alleged violations of the reporting requirements of the Act in an incident unrelated to the discharge charged in the first two counts. Kuhn was convicted of all counts after a three-week jury trial, but this Court dismissed count two on double jeopardy grounds. *United States v. Kuhn,* 165 F.Supp.2d 639 (E.D.Mich.2001). The Court conducted a sentencing hearing on October 18, 2001 and determined that the net offense level under the United States Sentencing Guidelines Manual was sixteen, which, when combined with Kuhn's criminal history category of one, yielded a range of 21 to 27 months. However, the Court determined that a sentence of that length would not serve the ends of justice in this case and was outside the "heartland" of such offenses as contemplated by the Federal Sentencing Guidelines and therefore departed downward four levels on grounds explained more fully below. The Court then sentenced Kuhn to six months in custody, which was to be served in a community corrections center, six months of supervised release, and a fine of $6000.

Kuhn has served his sentence. However, the government was not satisfied and appealed the sentence. On October 1, 2003, the court of appeals held that the four-level departure was erroneous and va-

cated the sentence. The court remanded the case for resentencing with instructions to give the government notice of any intended basis for departing from the Sentencing Guidelines. There was no other limitation on the Court's sentencing prerogative stated in the mandate. *United States v. Kuhn,* 345 F.3d 431, 440 (6th Cir.2003).

A new sentencing hearing was held on April 13, 2004. The defendant moved for a downward departure on the grounds of aberrant behavior under U.S.S.G. Section 5K2.20. The Court considered and denied the defendant's motion for a downward departure on that ground. The defendant then orally moved for a downward departure on the basis of his employment history and charitable deeds under Sections 5K2.0(c) and 5H1.11. The Court took the motion under advisement to give the parties ample time to file whatever submissions they desired. In the interim, however, the sentencing landscape changed dramatically with the Supreme Court's decision in *Blakely v. Washington,* 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which invalidated a state sentencing scheme in which a defendant's sentence exposure within the statutory maximum penalty could be increased under the Sentencing Guidelines by judge-found facts that had not been determined by a jury. The Court stated: "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment'... and the judge exceeds his proper authority." *Id.* at 2537 (citation omitted). The possible implications of the *Blakely* decision on the Federal Sentencing Guidelines was obvious but uncertain, and the Su-

preme Court granted certiorari on two cases to address those points. *See United States v. Booker,* —— U.S. ——, 125 S.Ct. 11, 159 L.Ed.2d 838 (2004) (granting petition for certiorari); *United States v. Fanfan,* —— U.S. ——, 125 S.Ct. 12, 159 L.Ed.2d 838 (2004) (same). The cases were argued on October 3, 2004.

In the meantime, the Sixth Circuit had determined that the Federal Sentencing Guidelines remained intact and directed district courts to continue operating under the Sentencing Guidelines until further guidance was received. *United States v. Koch,* 383 F.3d 436, 438 (6th Cir.2004) (en banc) (noting that "[w]e are not the first court to consider this question and we will not be the last, as the Supreme Court has scheduled oral arguments on this question for October 4, 2004.... Because we cannot expect a final answer from the Court for several months and because the judges in this Circuit deserve guidance in the interim, we granted Koch's en banc petition. We now join our colleagues in the Second and Fifth Circuits in determining that *Blakely* does not compel the conclusion that the Federal Sentencing Guidelines violate the Sixth Amendment"). The court acknowledged that the law may change. *Id.* at 443 (stating: "It may be that the trajectory of *Apprendi* [*v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)], *Ring* [*v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)] and *Blakely* will end with a nullification of the Guidelines. But, in the face of these relevant precedents, it is not for us to make that prediction or to act upon it. Not only would such a ruling be of some consequence to the Guidelines, but it also would be in tension with whole bodies of law that the lower courts long have been obliged to follow"). Until that time, however, the Court was to apply the sentenc-

ing rules prescribed by the Sentencing Guidelines Manual.

On January 12, 2005, the Supreme Court held that the Federal Sentencing Guidelines were unconstitutional. *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005). The Court reached this conclusion in two stages, with different members comprising the majority at each stage. First, the Court reaffirmed the constitutional principle first articulated in the sentencing context in *Apprendi v. New Jersey,* and reaffirmed in *Blakely:* "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.,* at 756. (opinion of the Court by Stevens, J.) This principle, the Court held applies to "sentencing factors" that serve to increase the applicable sentencing range prescribed by the Federal Sentencing Guidelines because the Guidelines "are mandatory and binding on all judges . . . [and] have the force and effect of laws." *Id.,* at 742. (The Court observed that "[i]f the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment." 125 S.Ct. at 750). Second, the Court held that as a consequence of its first holding, Title 18 U.S.C., Section 3553(b)(1), which makes the Sentencing Guidelines mandatory, is "incompatible with today's constitutional holding . . . [and] must be severed and excised." *Id.,* at 756 (opinion of the Court by Breyer, J.). Therefore, "the Guidelines effectively [are] advisory . . . requir[ing] a sentencing court to consider Guideline ranges . . . but permit[ting] the court to tailor the sen-

tence in light of other statutory concerns as well." *Ibid.*

This Court has considered the applicable Guideline range as originally calculated as well as other factors set forth in 18 U.S.C. § 3553(a), namely, the nature and circumstances of the offense and the defendant's history and characteristics, the need to promote respect for the law and provide just punishment in light of the seriousness of the offense, deterrence, the protection of the public from further crimes of the defendant, and rehabilitation. The Court now proceeds to determine Kuhn's motion for downward departure based on the applicable—and now advisory—Federal Sentencing Guidelines provisions. Within the framework of the Guidelines and the pre-*Booker* departure jurisprudence in this Circuit, the Court concludes that, based on the facts in the record concerning the defendant's charitable contributions, good works, community service, and employment history, a downward departure is justified in this case under Sections 5K2.0(c) and 5H1.11. Accordingly, the Court will grant the requested departure and sentence the defendant below the recommended Guideline range.

## I.

The facts of the case for sentencing purposes were summarized by the court of appeals as follows:

Michael J. Kuhn was sentenced to six months at a halfway house and six months of supervised release following his conviction for improperly discharging a pollutant into navigable waters, causing an employee to falsify test results in records submitted to the government, and signing and submitting a report to the government that he knew contained false test results. The government . . . appeal[ed] a four-level downward departure granted by [this

Court] to Kuhn. [On October 1, 2003, the Sixth Circuit vacated Kuhn's sentence and remanded the case to this Court for resentencing.]

Kuhn was the Superintendent of the Bay City, Michigan, Wastewater Treatment Plant (the Plant). The wastewater that comes into the Plant goes through a number of stages before being released into the Saginaw River. On or about August 25, 1996, during the midnight shift, staff at the Plant began cleaning the chlorine contact chamber, which is the penultimate stage of the process. The Plant had a National Pollutant Discharge Elimination System (NPDES) permit that governed its operation under the Clean Water Act (CWA). The plant was obligated to notify the Michigan Department of Environmental Quality (DEQ) within five days of any accidental spill or bypass of the treatment system. At the end of August 1996, sludge from the chlorine contact chamber was illegally pumped into a ditch while the chlorine contact chamber was being cleaned. [The jury determined that t]his was done on Kuhn's orders. In November 1996, Kuhn had the soil from the ditch excavated and hauled away.

Pursuant to the Plant's NPDES permit, the Plant was required to submit monthly discharge monitoring reports to the DEQ. As superintendent, Kuhn certified the accuracy of the information in these reports. The reports contained data regarding laboratory findings charting both the material coming into the Plant ("influent") and the material being discharged from the Plant ("effluent"). A Plant technician drew Kuhn's attention to very high numbers for BOD–5[1] on a sample drawn May 3, 1997. Kuhn asked the technician to change the results, and the technician refused. The technician made a copy of

the original printout, suspecting that the numbers might be altered in the final report to the DEQ. Later, another technician gave the final report for the month of May to Kuhn for his review and signature. He told her that the test results for suspended solids, total phosphorous, and BOD–5 for May 3 must be wrong and asked her to change the numbers to the averages for the month. She refused. However, when she checked the final report, the data for May 3 had been changed to the monthly averages.[2] Kuhn then asked yet another technician to change the test results, which he did. The technician wrote a memo memorializing the fact that he had changed the test results at Kuhn's direction. Kuhn signed the final, altered report on June 10, 1997, and submitted it to the DEQ.

---

1   "BOD–5" refers to a test which measures a wastewater sample's "Biochemical Oxygen Demand" over a 5–day period.

2   Kuhn maintains that the high numbers were only for the influent flow and that the numbers for the effluent flow were in line with the monthly averages. He therefore purportedly concluded that the influent flow numbers must have been incorrect.

Kuhn was subsequently indicted in a four-count indictment that charged: first, that between August 23 and 30, 1996, Kuhn knowingly caused plant workers to dispose of sewage sludge improperly, which resulted in the sludge flowing into a ditch on the plant property and then into the Saginaw River, a navigable waterway, in violation of 33 U.S.C. § 1345(a) and 18 U.S.C. § 2; second, that between the same dates he knowingly caused the sewage sludge to be discharged from the ditch into the Saginaw River, in violation of 33 U.S.C. § 1311(a) and 18 U.S.C. § 2; third, that on June 9, 1997, he caused an employee to assist in falsifying test results that

were included in records that, under the CWA, were required to be filed, in violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; and fourth, that on June 10, 1997, he signed and submitted to the DEQ a discharge monitoring report, required by the CWA, which he knew contained the false test results, in violation of 33 U.S.C. § 1319(c)(4).

After a three-week jury trial, the jury returned a verdict of guilty on all counts. Kuhn filed a post-verdict motion for judgment of acquittal. The district court granted this motion in part, dismissing count two on double jeopardy grounds. The presentence report (PSR) calculated Kuhn's sentencing range at 30–37 months, with a total offense level of nineteen. This number was reached by finding a base offense level of six for count one (U.S.S.G. § 2Q1.3(a)). The PSR then recommended two four-level increases for specific offense characteristics: pursuant to § 2Q1.3(b)(1)(B), due to the offense involving a discharge or release of a pollutant; and pursuant to § 2Q1.3(b)(4), due to the offense involving a discharge without a permit or in violation of a permit. The PSR recommended two additional two-level increases: pursuant to § 3B1.1(c) for Kuhn's role as an organizer, leader, manager, or supervisor in a criminal activity; and pursuant to § 3B1.3 due to his abuse of a position of public trust in a manner that significantly facilitated the commission or concealment of this offense. This resulted in a recommended adjusted offense level of eighteen for count one.

For counts three and four, the PSR recommended a base offense level of six (§ 2Q1.3(a)) with the same two increases for leadership role and abuse of a position of public trust. This resulted in a recommended adjusted offense level of ten for counts three and four. Accord-

ing to the grouping rules, found at § 3D1.4, one offense level was added to the group with the highest adjusted offense level. Therefore, the recommended combined adjusted offense level was nineteen.

At the sentencing hearing, the defense objected to the addition of the increases for the two specific offense characteristics. The court overruled this objection, finding that application of the two specific offense characteristics did not constitute double-counting. Next, the government objected to the PSR's omission of its requested 11–level enhancement pursuant to § 2Q1.3(b)(2) because the offense resulted in a substantial likelihood of death or serious bodily injury. The court overruled the government's objection. Next, the government objected to the PSR's failure to include a two-level increase for obstruction of justice, pursuant to § 3C1.1 and application note 4(b), based on Kuhn's false testimony given at trial. The court overruled the government's objection.

The defense did not object to the two two-level increases for Kuhn's leadership role and abuse of a position of public trust. The defense, however, did move for a downward adjustment or departure, based on § 2Q1.3, application notes 4 and 7, which advise the court that upward and downward departures are appropriate depending upon the harm or risk associated with the offense. The court departed downward two levels with regard to each offense characteristic, for a total of four levels subtracted from the adjusted offense level for count one. The court explained that testing of the affected areas did not indicate any presence of PCBs, that the chlorine contact chamber was the last stage that polluted water reached before it was released into the environment, and that

there were serious questions in the court's mind "as to whether any of the contents of that ditch ever made it into the Saginaw River."

At this point, the adjusted offense level for count one stood at fourteen. The court then calculated that, pursuant to § 3D1.4, two levels were to be added to that for grouping purposes. This resulted in a combined offense level of sixteen. The defense then moved for a downward departure based on Kuhn's acts of a charitable or public service nature within the community.

The court denied the motion, but went on to state that it doubted that a 21– to 27–month term of incarceration "serves the ends of justice in this case." The court stated that it questioned the two two-level adjustments for role in the offense and abuse of a position of public trust. It stated that "the offense in this case did not necessarily entail an abuse of trust that was separate and apart from the defendant's position that permitted him to be a leader or organizer of the activity." Therefore, the court concluded, scoring the two adjustments in a single case constituted an over-counting. Moreover, the court stated that, although applying the two specific offense characteristics did not constitute double-counting, it "put undue weight on the offense characteristics for this specific offense," because the offense for which Kuhn was convicted consisted of a single discharge. The court also noted that it felt that the sentence in the case

> ought to be fashioned around the fact that the discharge in this case resulted from essentially a single incident that occurred over a day or two, and was motivated by the defendant's desire to make the plant more efficient so that it would perform the function of enhancing the environmental quality as opposed to degrading it.

Therefore, the court departed downward by four additional levels.

In its judgment, the court added more reasons for granting the additional four-level downward departure, indicating that "[t]he circumstances of this case, including the defendant's motivation and purpose, takes this case out of the 'heartland' of offenses contemplated by the Sentencing Guidelines." First, the court reiterated that Kuhn "was motivated by a desire to clean up and improve the efficient operation of the Bay City Wastewater Treatment Plant." Apparently, the court concluded that Kuhn was taking a shortcut, engaging in conduct not authorized by the permit issued to the plant, and violated the Clean Water Act in so doing. The court went on to say:

> Given the defendant's background, however, his length of service in the area of public waste management, and other minor factors such as his community involvement and exemplary personal record of achievements in the community, the Court finds credible the defendant's professed motive that the efficient, pollution-free operation of the Bay City Wastewater Treatment Plant was his ultimate goal.

Therefore, the court imposed a sentence based on offense level twelve and a criminal history category of I. Kuhn was sentenced to six months at a halfway house, six months of supervised release, and the minimum fine of $6,000.

*Kuhn,* 345 F.3d at 432–36.

The court of appeals vacated the sentence because this Court failed to give notice in advance of the sentencing hearing as Required by Rule 32 of the Federal Rules of Criminal Procedure that it was considering a departure on the grounds

considered. The court of appeals also rejected the reasoning that a departure based on enhancements for Kuhn's role in the offense was warranted where this Court found that Kuhn's position of trust essentially was based on the same facts that supported the enhancement as a leader or organizer and therefore was overcounted. *Kuhn*, 345 F.3d at 436–38. The court also determined that this Court should not have departed downward four levels on the basis that scoring enhancements for both U.S.S.G. § 2Q1.3(b)(1)(A) (discharge of a pollutant) and § 2Q1.3(b)(4) (discharge in violation of a permit) put undue weight on these offense characteristics. *Kuhn*, 345 F.3d at 438–440. Finally, the court held that considering Kuhn's motivation and purpose for committing the crime as a basis for finding that the crime fell outside the heartland of pollution offenses was improper. *Id.* at 440. However, the court left to this Court the decision of whether any other ground may incorporate that reason.

## II.

The defendant argues that his employment and his charitable deeds are so substantial, when considered together, to warrant a downward departure. Section 5K2.0(c) sets forth limitations on departures based on multiple circumstances. That section specifically states that offender characteristics, which may be insufficient standing alone, may be combined to justify a departure. U.S.S.G. § 5K2.0 (noting that a "constellation of pertinent factors warrants a departure"). The defendant asserts that he was a dedicated employee of the Bay City Waste Water Treatment Plant from 1971 until 2000. He was also involved in numerous charitable acts and has a history of enriching his community. Thus, he reasons, it is permissible for the Court to grant a downward departure based on the defendant's employment history and long list of charitable acts.

The government states that according to a report from the Sentencing Commission, departures under Section 5K2.0(c) must be based on circumstances identified in the Guidelines, the circumstances for departure must be present individually to a substantial degree and must make the case exceptional when considered together, and departures should occur extremely rarely and only in exceptional circumstances. The government argues that this case is not one of those extremely rare cases where a departure even on the basis of a combination of factors is warranted.

United States Sentencing Guideline Section 5K2.0(c) provides as follows:

> The court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure, only if—
>
> (1) Such offender characteristics or other circumstances, taken together, make the case an exceptional one; and
>
> (2) Each such offender characteristic or other circumstance is—
>
> (A) present to a substantial degree; and
>
> (B) identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted.

Section 5H1.11 contains a policy statement that "[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."

Nonetheless, under pre-*Booker* law, a court could depart from the Sentencing Guidelines if the circumstances of the case were sufficiently unusual and "outside the heartland of cases" to warrant such a departure. *United States v. Tocco,* 200 F.3d 401, 432 (6th Cir.2000). In *Koon v. United States,* 518 U.S. 81, 91, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court discussed the factors that may or may not be considered by a district court in determining whether a departure from the Guidelines is warranted. The Court identified "encouraged factors," which "are those 'the Commission has not been able to take into account fully in formulating the guidelines.'" *Id.* at 94, 116 S.Ct. 2035 (citing U.S.S.G. § 5K2.0). The Court also discussed "discouraged factors," which "are those 'not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range.'" *Id.* at 95, 116 S.Ct. 2035 (quoting 1995 U.S.S.G. ch. 5, pt. H, intro. comment.). Examples of those "discouraged factors" include a defendant's civic contributions and his family ties and responsibilities. *See Tocco,* 200 F.3d at 432–33. Although those factors are "not necessarily inappropriate," the Court noted, they should only be relied on as a basis for departure "in exceptional cases." *Koon,* 518 U.S. at 95, 116 S.Ct. 2035.

The Guidelines list certain factors that may never be considered for the basis for departure. *See* U.S.S.G. § 5H1.10 (race, sex, national origin, creed, religion, socio-economic status); § 5H1.4 (drug or alcohol dependence). "With the exception of those factors, the guidelines do not 'limit' the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.'" *Tocco,* 200 F.3d at 433 (quoting U.S.S.G. ch. 1, pt. A, intro. comment). A "charitable work is not a forbidden ground for departure." *United States v.*

*Crouse,* 145 F.3d 786, 790 (6th Cir.1998). "A defendant's ties to a community is normally a discouraged factor under the Guidelines." *Id.* (citing U.S.S.G. § 5H1.6).

In *Crouse,* the defendant was convicted by his guilty plea to charges arising from a conspiracy to produce adulterated orange juice. At sentencing, the district court departed downward from the Guidelines based on the defendant's record of community service, the court's desire to achieve proportionality in sentencing among the defendant's co-conspirators, and the extensive adverse publicity the defendant had received in his community. On appeal, the Sixth Circuit reversed the sentence and remanded for re-sentencing finding that the district court erred in its departure based on proportionality in sentencing and adverse publicity. However, the court upheld the departure based on charitable service deferring to the district court's factual finding that the case was sufficiently unusual to take it out of the heartland of white collar offenders and noting that the government did not oppose the departure on those grounds. *Id.* at 790.

In *Tocco,* the Sixth Circuit reversed a sentence based on charitable contributions. In that case, the defendant was convicted of a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act. In departing downward based on community involvement, the district court noted that the defendant had "participated in no less than twelve charitable and civic organizations" and a "flood of letters poured into the court that strongly supported Tocco and urged leniency in his sentencing." *Tocco,* 200 F.3d at 433. However, the Sixth Circuit found that "much of Tocco's contributions may have consisted of contributions of money, not time and energy" and thus remanded the case for the district court to determine whether the defendant's community contri-

butions involved financial contributions or "significant contributions of Tocco's time and personal skill and involvement." *Id.* at 434.

■ Thus, according to *Crouse* and *Tocco*, the Court finds that it may depart downward in this case if it determines that the defendant's charitable contributions and involvement in the community, including his continuous employment history in the public sector, are sufficiently unusual and "outside the heartland of cases" to warrant such a departure and involved a significant contribution of the defendant's time, personal skill, and personal involvement.

The Court believes that based on the facts of the case, including this Court's findings at the first sentencing regarding the defendant's "community involvement and exemplary personal record of achievements in the community," *See Kuhn*, 345 F.3d at 435, a downward departure from the now-advisory Sentencing Guidelines is warranted. The defendant's involvement in his community extends well beyond mere financial contributions. Rather his community involvement includes thirty years as a Eucharistic and homebound minister, lector and parish council member at Holy Trinity church; service on the board of directors of the Bay Arts Council; president of Bay Fresh Start program, which is a local alternative to probation; volunteer worker for Habitat for Humanity and the Paint & Pride program; sponsor for the Delta College public television auction for over ten years; member of the Bay City All Saints School Board; volunteer athletic coach at the local YMCA; and volunteer at Bay City Creative Caring preparing meals for the day care center. He also has assisted residents of the Arete Center, a community corrections facility, obtain employment.

In addition, the Court has received a large volume of letters submitted on the defendant's behalf from individuals, including community and civic leaders, that are compelling and urge leniency. Moreover, as demonstrated above, it appears that the defendant was personally involved in community service and did not merely give financial contributions to the organizations as in *Tocco*. Therefore, taking all of the relevant factors into account per Section 5K2.0, the defendant's motion for downward departure based on community service is justified, takes this offender outside of the heartland of offenders contemplated by the Guidelines, and favors a departure.

■ The defendant contends that his work history also constitutes grounds for a departure. In support of this argument, he cites *United States v. Jagmohan*, 909 F.2d 61 (2d Cir.1990), and *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990). In *Jagmohan*, the defendant was convicted of bribing a government official. The district court departed downward based, in part, on the fact that the defendant had been gainfully employed since he came to the United States nine years earlier. The Second Circuit stated that taken alone, the defendant's employment history "is not especially remarkable" but coupled with the "unusual circumstances of the offense"— the defendant used a personal check in the bribery transaction—the court found that the downward departure was justified. *Jagmohan*, 909 F.2d at 65. In *Big Crow*, the defendant was convicted of assault with a deadly weapon on a reservation. The district court departed downward based on the defendant's "excellent employment record and his consistent efforts to overcome the adverse environment of the Pine Ridge reservation." *Big Crow*, 898 F.2d at 1326. The Eighth Circuit affirmed the sentence noting that the unemployment rate on the reservation was

seventy-two percent and the per capita annual income was estimated at $1,042. The court stated:

> We believe that the district court acted within its discretion in sentencing Big Crow below the Guideline range, and that Big Crow's excellent employment history, solid community ties, and consistent efforts to lead a decent life in a difficult environment are sufficiently unusual to constitute grounds for a departure from the Guidelines in this case. We also find that the sentence the district court imposed is reasonable and adequate to serve the ends which sentencing under the Guidelines should promote.

*Id.* at 1332.

In this case, the defendant's employment history is not as remarkable as the defendant in *Jagmohan,* who was not a native of this country but had worked steadily in the United States for nine years, or the defendant in *Big Crow,* who had spent a life on a reservation in difficult circumstances but maintained steady employment. However, the defendant is correct that his employment history can be combined with his community service to justify a departure, just as the defendant in *Jagmohan* had his work history combined with the other factors in the case to warrant a departure.

■ The government's argument against granting a departure is essentially that this case is not an exceptional one in which the circumstances considered together justify a departure. The government contends that the defendant has shown a lack of remorse for the crimes he committed and has stated that his lack of remorse is justified by his claimed good motives for committing the offenses. The government cites *United States v. Kim,* 364 F.3d 1235 (11th Cir.2004), for the proposition that a defendant must show

"extraordinary remorse" such as paying a 140 percent restitution to a victim to justify a departure, and *United States v. Saucedo–Patino,* 358 F.3d 790, 794–95 (11th Cir.2004), to support its argument that a defendant's laudable motive for committing an offense combined with the defendant's desire to take care of his family does not constitute sufficient justification for downward departure. Neither case overcomes the rule that a district court, under Sixth Circuit precedence, may depart downward in this case if the court finds that the defendant's involvement in the community is sufficiently unusual and "outside the heartland of cases" to warrant such a departure and involve a significant contribution of the defendant's time, skill, and personal involvement. *See Tocco,* 200 F.3d at 433–34. Although a lack of remorse might be a factor that counters community involvement, it does not preclude a finding favorable for a downward departure in this case, especially when community involvement is coupled with consideration of the defendant's continuous employment history in the public sector. Moreover, a lack of remorse may be offset by a factor left open by the court of appeals, namely the defendant's motive and purpose in committing the offense. Here, as the Court previously observed, the defendant's actions were prompted by his desire to make the Bay City waste water treatment plant more efficient. Although he may have taken an illegal "short cut," in the words of the court of appeals, *Kuhn,* 345 F.3d at 435, and this motivation will not in itself take the case out of the heartland, it is a factor that bears on the question of remorse and is sufficient to counterbalance the government's argument.

The government also points to *United States v. Thurston,* 358 F.3d 51 (1st Cir. 2004), in which the defendant was convicted of defrauding the Medicare program of

over five million dollars. The district court departed downward at sentencing partly on the defendant's "good works" under Section 5H1.11. The district court stated that "in over fourteen years of sentencing defendants, it's my judgment that no one had a more extraordinary devotion to charitable work, community service, and especially ... to his church." *Id.* at 79. The district court noted that the defendant tithes ten percent of his income to his church, had taken family members and others into his home, and had helped an infirm neighbor lay sod at the neighbor's house. On appeal, the First Circuit reversed the sentence. The court noted that the "exceptional case hurdle" for discouraged departures," such as for good works, "is a very high one." *Id.* at 79–80. The court also stated that

> [t]he context of the defendant's good works is important. Here, Thurston's position as a prominent corporate executive weighs in our analysis. It is hardly surprising that a corporate executive like Thurston is better situated to make large financial contributions than someone for whom the expenses of day-to-day life are more pressing; indeed, business leaders are often expected, by virtue of their positions, to engage in civic and charitable activities. Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot. *See United States v. Morken,* 133 F.3d 628, 629–30 (8th Cir.1998) (reversing a downward departure because the defendant's good works were not exceptional in light of his income and preeminence in a small town); *United States v. Kohlbach,* 38 F.3d 832, 838–39 (6th Cir.1994) (vacating a good works departure because "it is *usual* and *ordinary,* in the prosecution of similar white collar crimes involving high-ranking corporate executives ... to find that a de-

fendant was involved as a leader in community charities, civic organizations, and church efforts" (emphasis in original)); *United States v. McHan,* 920 F.2d 244, 248 (4th Cir.1990) (similar).

*Id.* at 80. The court found that the defendant's religion was a "neutral fact" and ultimately that the defendant's "offense mitigates against concluding that his good works are 'exceptional.' Health care fraud is a serious crime and the federal interest in combating it is powerful. . . . That fact seriously undercuts [the defendant's] claim that his good works are 'exceptional' in context." *Id.* at 81.

The government believes a finding similar to *Thurston* could be made here. However, several important facts distinguish *Thurston* from this case. First, the defendant was not a corporate executive of the type depicted by the defendant in *Thurston.* Although Kuhn made a decent living, according to the presentence report, it is not one that permits him to contribute large sums of money to charitable organizations without effort like the defendant in *Thurston.* Moreover, the defendant's crime is not as serious as the health care fraud involved in *Thurston* and therefore the defendant's offense does not offset his charitable works and community involvement.

It is interesting to note that, according to statistics furnished to the Court by the United States Sentencing Commission, twenty-five cases arose between 1998 and 2002 involving a violation of the statutes involved in this case for which sentences were imposed. The average prison length in cases involving violations of environmental statutes over that period was 11.9 months. All but one of the cases involved defendants in criminal history category I, and nearly all of the twenty-five cases included increases in offense levels based on Sections 2Q1.3(b)(1)(A) or (B) and 2Q1.3(b)(4). There were downward depar-

tures in ten of those cases (six on the basis of substantial assistance).

The Sentencing Guidelines in this case suggest a sentence in the range of 21 to 27 months. The Court believes, however, that the nature and circumstances of the offense and the defendant's history justifies a sentence below that range. The Court is mindful of the importance of the environmental statutes and the need to enforce the strictures that ensure the safety of the environment. A sentence below the recommended range will achieve that goal. The stigma of a criminal record, exposure to a sentence of confinement (as the defendant has already served in this case), and monetary fines also promote respect for the law and provide just punishment in light of the seriousness of the offense, and they serve as a deterrence to others.

### III.

The Court has considered the Sentencing Guidelines, and although they have been rendered advisory, the Court has accorded them significant weight. The Court also has considered the grounds for departure advanced by the defendant and finds merit in his arguments.

Accordingly, it is **ORDERED** that the defendant's motion for downward departure [dkt # 57] is **GRANTED.**

It is further **ORDERED** that the "split sentence" previously imposed is found to be an appropriate sentence under a totality of the circumstances. The sentence of six months in custody served in a community corrections center followed by six months of supervised release with the condition of home confinement on each of counts 1, 3, and 4, to be served concurrently, plus a fine of $6,000, is reimposed.